IN THE MATTER OF HILDA M. PETER, BY HER GUARDIAN, EBERHARD JOHANNING.

Argued November 5, 1986—Decided June 24, 1987.

366

*Nicholas E. Caprio* and *Donald S. Goldman* argued the cause for appellant, Hilda M. Peter, by her guardian Eberhard

Johanning (*Harkavy, Goldman, Goldman & Caprio,* attorneys).

*Steele R. Chadwell,* General Counsel, argued the cause for respondent, Office of the Ombudsman for Institutionalized Elderly of the State of New Jersey (*Steele R. Chadwell,* attorney; *James E. Madden* and *Louis G. Karagias,* on the brief).

*John R. Heher* submitted a brief on behalf of *amicus curiae* New Jersey Hospital Association (*Smith, Stratton, Wise, Heher & Brennan,* attorneys; *John R. Heher* and *Wendy L. Mager,* on the brief).

*Fenella Rouse* and *Elena N. Cohen,* members of the New York bar, and *Jo Anne C. Adlerstein* submitted a brief on behalf of *amicus curiae* Society for the Right to Die, Inc. (*Stern, Dubrow & Marcus,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal requires us to set forth the guidelines under which a life-sustaining nasogastric tube may be withdrawn from a sixty-five-year-old nursing home patient who is in a persistent vegetative state with no hope of recovery, but is not expected to die in the near future.

Hilda Peter was a secretary at Irvington General Hospital. From 1982 until she became incapacitated, she lived with her close friend, Eberhard Johanning. In October 1984, he found her collapsed on their kitchen floor. She was resuscitated by paramedics but has remained comatose in a persistent vegetative state. Her body can maintain only the vegetative parts of neurological functions. There is no reasonable hope that she will ever regain any cognitive capacity. Since January 1985, she has been sustained by a nasogastric tube in a nursing home.

In 1983, Ms. Peter executed a power of attorney, which specifically authorized Eberhard Johanning

to make all decisions with respect to [her] health, as if he were next of kin; to hire physicians, nurses or other medical personnel if any, and all medical treatment which [she] require[s], and to be authorized to consent to any medical treatment, operation or medical procedure [she] might require, to be given full and complete authority to manage and direct [her] medical care.

In October 1985, Mr. Johanning filed a Complaint in the Superior Court, Chancery Division, seeking his appointment as guardian of Ms. Peter.[1] After an evidentiary hearing without a jury, the trial court adjudicated Ms. Peter an incompetent and appointed Mr. Johanning as her guardian. The court ordered that Mr. Johanning "not make any decisions to withhold or withdraw medical care or treatment without first notifying and obtaining the acquiescence of the State of New Jersey, Office of the Ombudsman for the Institutionalized Elderly."

By letter Mr. Johanning as Guardian requested that the Ombudsman approve removal of Ms. Peter's nasogastric tube. The Ombudsman investigated her situation and had her examined by two physicians. Relying on medical reports submitted by these physicians and Ms. Peter's attending physician, the Ombudsman found that:

Hilda Peter is a legally incompetent 65–year-old nursing home patient with major neurological impairments who has no expectation of coming out of her persistent vegetative state. She does not swallow reliably and requires nasogastric tube feedings to exist. Though she is vegetative without any hope of recovery, her physical condition is quite good. She could survive for many years, possibly decades. As long as the precise and careful nursing care that she now receives is maintained, she can continue in this state for an indeterminate length of time.

The Ombudsman concluded that "Hilda Peter would not have wanted to be kept alive by mechanical means in a persistent vegetative state." At the press conference he called to announce his decision, the Ombudsman was unequivocal on this point. "I am convinced," he stated, "that Hilda Peter would not have wanted to continue life in this way, and were she competent, her right to choose would be respected." Press

---

[1]Ms. Peter's only living relative supports Mr. Johanning's guardianship and his decision to remove her nasogastric tube.

conference statement of Jack R. D'Ambrosio, Jr., Ombudsman for the Institutionalized Elderly (Mar. 6, 1986).[2] Nevertheless, the Ombudsman decided that our ruling in *In re Conroy*, 98 *N.J.* 321 (1985), precluded him from consenting to the removal of Ms. Peter's nasogastric tube. While the guardian's appeal from that decision was pending unheard in the Appellate Division, we granted his application for direct certification. 105 *N.J.* 517 (1986).[3]

I

■ The cornerstone of our analysis of any request to decline life-sustaining medical treatment on behalf of an incompetent patient is our holding today in *In re Farrell*, 108 *N.J.* 335 (1987), that a competent patient has the right to refuse life-sustaining medical treatment. That right is not lost because of incompetency. *See Conroy, supra*, 98 *N.J.* at 356, 359–60; *In re Quinlan*, 70 *N.J.* 10, 41, *cert.* denied *sub nom. Garger v. New Jersey*, 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976). All patients, competent or incompetent, with some limited cognitive ability or in a persistent vegetative state, terminally ill or not terminally ill, are entitled to choose whether or not they want life-sustaining medical treatment. We have previously explained that a surrogate decisionmaker may assert an incompetent patient's rights to self-determination and privacy. *See Conroy, supra*, 98 *N.J.* at 356; *Quinlan, supra*, 70 *N.J.* at 41. In order truly to preserve those rights, "the goal of decision-making for incompetent patients should be to determine and effectuate, insofar as possible, the decision that the patient would have made if competent." *Conroy, supra*, 98 *N.J.* at 360; *see Quinlan, supra*, 70 *N.J.* at 41.

---

[2]On appeal to this Court, the Ombudsman's position has changed. He now maintains that not enough evidence proves that Hilda Peter would want her nasogastric tube disconnected. *See infra* at 375–376.

[3]We permitted the participation as *amici curiae* of the Society for the Right to Die, Inc. and New Jersey Hospital Association.

■ Medical choices are private, regardless of whether a patient is able to make them personally or must rely on a surrogate. They are not to be decided by societal standards of reasonableness or normalcy. Rather, it is the patient's preferences—formed by his or her unique personal experiences—that should control.

■ The privacy that we accord medical decisions does not vary with the patient's condition or prognosis. The patient's medical condition is generally relevant only to determine whether the patient is or is not competent, and if incompetent, how the patient, in view of that condition, would choose to treat it were she or he competent.

## II

The Ombudsman for the Institutionalized Elderly is involved in this case pursuant to his mandate under *N.J.S.A.* 52:27G–1 to –16 to guard against abuse of elderly nursing home patients.[4] Because of the particularly vulnerable nature of elderly incompetent patients in nursing homes, the Ombudsman must scrutinize all decisions to withhold or withdraw life-sustaining medical treatment from them. *Conroy, supra,* 98 *N.J.* at 383–85.

In *Conroy,* we considered the plight of "an elderly, incompetent nursing-home resident with severe and permanent mental and physical impairments and a life expectancy of approximately one year or less." *Id.* at 363. The Ombudsman can approve a surrogate decision to decline life-sustaining treatment on behalf of such a patient only when one of three tests is satisfied, *viz:*

1. It is clear that the particular patient would have refused the treatment under the circumstances involved. This is the "subjective" test. *Id.* at 360–64;

---

[4] The Ombudsman has responsibility for persons 60 years of age or older who are patients, residents, or clients of public or private facilities or institutions offering health or health related services for the institutionalized elderly that are subject to regulation, visitation, inspection, or supervision by any government agency. *N.J.S.A.* 52:27G–2(f), (i).

2. There is some trustworthy evidence that the patient would have refused the treatment, and the burdens (the pain and suffering) of the patient's continued life with the treatment markedly outweigh the benefits (any physical pleasure, emotional enjoyment or intellectual satisfaction) that the patient may still be able to derive from that life. This is the "limited-objective" test. *Id.* at 365–66; or

3. The pain and suffering of the patient's life with the treatment clearly and markedly outweigh the benefits that the patient derives from life, and the patient is suffering from so much pain that prolonging his life would be inhumane. This is the purely "objective" test. *Id.* at 367.

■ The Ombudsman believes that the tests and procedures set forth in *Conroy* control whether Ms. Peter's guardian can choose to withdraw the nasogastric tube that sustains her. We disagree. *Conroy* was specifically concerned with "elderly, formerly competent patients" like Claire Conroy, "who, *unlike Karen Quinlan,* are awake and conscious and can interact with their environment to a limited extent.... The capacities of such people, while significantly diminished, are not as limited as those of irreversibly comatose persons...." *Id.* at 359. Ms. Peter is not a Claire Conroy-type patient. Rather, like Karen Quinlan, she is in a persistent vegetative state. In the cases of such patients, the one-year life-expectancy test and the limited-objective and objective tests set forth in *Conroy* are inapplicable, and we look instead primarily to *Quinlan* for guidance.

Under *Quinlan,* the life-expectancy of a patient in a persistent vegetative state is not an important criterion in determining whether life-sustaining treatment may be withdrawn. For this kind of patient, our "focal point ... should be the prognosis as to the reasonable possibility of return to cognitive and sapient life, as distinguished from the forced continuance of ... biological vegetative existence." 70 *N.J.* at 51. *See generally* Note, *The "Terminal Condition" Condition in Virginia's Natural Death Act,* 73 *Va.L.Rev.* 749, 771 (1987) (contrasting *Quinlan's* "prognosis-based approach" with the approach of statutes that condition the right to decline treatment on the patient's life-expectancy).

Life-expectancy analyses assume that there are at least some benefits to be derived from the continued sustenance of an

incompetent patient. That assumption, which is usually valid, *see President's Commission For the Study of Ethical Problems in Medicine and Biomedical Research, Deciding to Forego Life-Sustaining Treatment* 3 (hereinafter *President's Commission Report*), *quoted in In re Farrell, supra,* 108 *N.J.* at 351, is not appropriate in the case of persistently vegetative patients such as Karen Quinlan or Ms. Peter. *See infra* at 375–376. In *Quinlan,* we recognized that most people would consider an artificially-prolonged vegetative existence "unendurable." 70 *N.J.* at 39–40. Since then other courts have similarly appreciated the special situation of surrogate decisionmakers for irreversibly vegetative patients, and have not made their option to choose among courses of medical treatment contingent on any life-expectancy test. *See, e.g., Corbett v. D'Alessandro,* 487 *So.*2d 368 (Fla.Dist.Ct.App.), review denied, 492 *So.*2d 1331 (Fla.1986) (deciding that husband of persistently vegetative patient could cause removal of her life-sustaining nasogastric tube); *In re Torres,* 357 *N.W.*2d 332 (Minn.1984) (allowing conservator to cause life-sustaining respirator to be withdrawn from persistently vegetative patient); *In re Colyer,* 99 *Wash.*2d 114, 660 *P.*2d 738 (1983) (allowing husband to discontinue life-support system sustaining his wife in persistent vegetative state); *see also Brophy v. New England Sinai Hosp.,* 398 *Mass.* 417, 435–36, 497 *N.E.*2d 626, 636 (Mass.1986) (condemning long-term artificial sustenance of vegetative patients). Accordingly, we hold that the *Conroy* life-expectancy test is inapplicable in determining whether life-sustaining treatment may be withdrawn or withheld from a patient in a persistent vegetative state.

Initially the Ombudsman indicated that Ms. Peter's indefinite life-expectancy was the only reason he would not approve Mr. Johanning's decision to remove her nasogastric tube. On appeal to this Court, however, he has changed his position. He now contends that even without a life-expectancy threshold, Ms. Peter's nasogastric tube should not be removed. He argues that not enough evidence proves that she would want it discon-

nected to satisfy *Conroy*'s "subjective" test, and that the lack of pain that she can experience in her vegetative state precludes withdrawal of the tube pursuant to *Conroy*'s "limited-objective" or "objective" tests.

The limited-objective and objective tests that we established for patients like Claire Conroy balance the benefits that a patient would experience by having his or her life extended by medical treatment against the "unavoidable pain" and suffering that he or she would feel as a result of the treatment. *Conroy, supra,* 98 *N.J.* at 365-67. Even in the case of a patient like Claire Conroy—the type of patient for whom the balancing tests were created—it can be difficult or impossible to measure the burdens of embarrassment, frustration, helplessness, rage, and other emotional pain,[5] or the benefits of enjoyable feelings like contentment, joy, satisfaction, gratitude, and well-being that the patient experiences as a result of life-sustaining treatment. "[M]edical experts are often unable to determine with any degree of medical certainty the extent of a non-verbal person's intellectual functioning or the depth of his emotional life." *Conroy, supra,* 98 *N.J.* at 368. Likewise, it is often "unclear whether and to what extent a patient such as Claire Conroy is capable of, or is in fact, experiencing [physical] pain." *Id.* at 367-68. For a perceptive analysis, see Cantor, *Conroy: Best Interests and the Handling of Dying Patients,* 37 *Rutgers L. Rev.* 543, 569 (1985).

While a benefits-burdens analysis is difficult with marginally cognitive patients like Claire Conroy, it is essentially impossible with patients in a persistent vegetative state. By definition such patients, like Ms. Peter, do not experience any of the benefits or burdens that the *Conroy* balancing tests are intend-

---

[5]Because the *Conroy* balancing tests are not applicable in this case, we do not reconsider today whether "unavoidable and severe" physical pain should be an essential burden under those tests. *See In re Jobes,* 108 *N.J.* 394, 424 (1987). *But see generally id.* at 447 (Handler, J., concurring); *see also Conroy, supra,* 98 *N.J.* at 388-99 (Handler, J., dissenting).

ed or able to appraise. Therefore, we hold that these tests should not be applied to patients in the persistent vegetative state.[6]

█ Rather, for those patients we look to *Quinlan* for guidance. Under *Quinlan*, if the guardian and family of a patient in a persistent vegetative state conclude that the patient would not want to be sustained by life-supporting treatment, and the attending physician agrees that the life-support apparatus should be discontinued, and both the attending physician and hospital prognosis committee verify the patient's medical condition, then the guardian can refuse such treatment on the patient's behalf. *Quinlan, supra*, 70 *N.J.* at 41. The interested parties need not have clear and convincing evidence of the patient's intentions; they need only "render their best judgment" as to what medical decision the patient would want them to make. *Id.* In the present case, however, Ms. Peter did leave clear and convincing evidence of her desire not to be sustained in her present condition. Therefore, we apply the *Conroy* subjective test in this case and do not detail how to apply the *Quinlan* guidelines to a vegetative patient in a nursing home. For such a discussion, see our decision today in *In re Jobes, supra*, 108 *N.J.* at 420–422.

### III

█ Our constant goal is to insure that patients' medical preferences are respected. Therefore, the *Conroy* subjective test is applicable in every surrogate-refusal-of-treatment case, regardless of the patient's medical condition or life-expectancy. Under this test, life-sustaining treatment may be withdrawn or

---

[6]We are aware that many fear that decisions that allow life-sustaining medical treatment to be withdrawn threaten elderly senile patients and victims of Alzheimer's disease. These elderly patients generally will fit within the *Conroy* pattern. Hence, for those patients—unless they left clear evidence of their disinclination for treatment—a one-year life expectancy test would be applied pursuant to the balancing tests before life-sustaining treatment could be withdrawn.

withheld whenever there is clear and convincing proof that if the patient were competent, he or she would decline the treatment. Once the subjective test is met, the patient's life expectancy and the balance between the benefits and burdens of continued treatment are no longer important. The patient's right to self-determination simply overrides these objective standards.

In applying the subjective test, we consider an exceptionally broad range of evidence. For a discussion of the various kinds of proof that may establish a patient's intent under the subjective test, see *Conroy, supra,* 98 *N.J.* at 362. Of course, some types of evidence are more helpful than others. Clearly, the best evidence is a "living will," a written statement that specifically explains the patient's preferences about life-sustaining treatment. Some states have statutes that recognize the validity of living wills and prescribe procedures for their execution. *See In re Farrell, supra,* 108 *N.J.* at 342–343 n. 2 (1987) (detailing relevant statutes). Unfortunately, the New Jersey Legislature has not enacted such a law. "Whether or not they are legally binding, however, such advance directives are relevant evidence of the patient's intent." *Conroy, supra,* 98 *N.J.* at 361 n. 5.

Hilda Peter did not leave a living will, but she did execute a durable power of attorney, which specifically authorizes Eberhard Johanning to make "all medical decisions" for her and "to be given full and complete authority to manage and direct her medical care." New Jersey's Powers of Attorney statute provides that a "principal may confer authority on an agent that is to be exercisable notwithstanding later disability or incapacity of the principal at law or later uncertainty as to whether the principal is dead or alive." *N.J.S.A.* 46:2B–8(a). Although the statute does not specifically authorize conveyance of durable authority to make medical decisions, it should be interpreted that way. *See Conroy, supra,* 98 *N.J.* at 361. *See generally President's Commission Report, supra,* at 146–47; Note, *Appointing An Agent to Make Medical Treatment Choices,* 84 *Colum.L.Rev.* 985, 1015–20 (1984) (recommending

that durable powers of attorney statutes be construed to empower conveyance of authority to make medical decisions).

It would have been better if Ms. Peter had specifically provided in her power of attorney that Mr. Johanning had authority to terminate life-sustaining treatment. Nonetheless, that instrument, which she executed shortly before she became incompetent; Mr. Johanning's explanation that Ms. Peter directed him to refuse life-sustaining treatment on her behalf in a situation like this;[7] and nine reliable hearsay accounts[8] of her disinclination for the kind of treatment that Mr. Johanning seeks to discontinue[9] establish clearly and convincingly that Hilda Peter would, if competent, choose to withdraw the nasogastric tube that is sustaining her.

---

[7]Mr. Johanning's affidavit states: "She trusted me with her life and urged me to avoid the indignity, discomfort and distress of remaining comatose forever.... There is no question that I know she would want me to make that judgment in her behalf...."

[8]In *Conroy, supra,* 98 *N.J.* at 362, we acknowledged that we were wrong in *Quinlan, supra,* 70 *N.J.* at 21–22, to disregard evidence of hearsay accounts of Ms. Quinlan's disapproval of certain uses of life-supporting treatment. Such evidence can shed light on whether a patient would consent to or refuse treatment. Hence we have considered similar evidence in this case.

[9]One person interviewed by the Ombudsman who knew Hilda Peter for three years claimed to have had several conversations with her regarding being maintained on life-sustaining systems, and reported that Hilda Peter stated in the summer of 1984, "Under no circumstances would I want to be kept alive on a life-support system. I've seen too much of this at the hospital and that's not for me." Hilda Peter was employed by Irvington General Hospital for 10 years.

Another interviewee stated that she had conversations with Hilda Peter on several unspecified dates in which Hilda Peter voiced "strong concerns" that her mother and Hilda Peter herself never be kept alive or their lives be extended by "extraordinary measures."

One person who knew Hilda Peter for 30 years claimed to remember a conversation with her shortly before the cerebral accident from which Hilda Peter now suffers, in which Hilda Peter stated, "I never want to be kept alive on a support system or anything like that."

Other persons reported that Hilda Peter stated very strongly that under no circumstances would she want to be kept alive on "any type of life support

■■■■■ Of course, a sufficiently strong state interest can subordinate any patient's right to choose among courses of treatment. Accordingly, we have considered the four traditional state interests in this case. *See In re Farrell, supra,* 108 *N.J.* at 348–354. We hold that they do not override Hilda Peter's right to decline continued artificial feeding. Moreover, we find it difficult to conceive of a case in which the state could have an interest strong enough to subordinate a patient's right to choose not to be artifically sustained in a persistent vegetative state. *See Quinlan, supra,* 70 *N.J.* at 39. Thus, where the Ombudsman determines that a patient like Hilda Peter has left clear and convincing evidence that he or she would not want to be sustained by life-support, judicial review of a surrogate's decision to give effect to the patient's preference is unnecessary unless a conflict arises among the surrogate decisionmaker, the family, the physician and the Ombudsman.

## IV

In *Conroy,* we expressly rejected any distinction between the termination of artificial feeding and the termination of other forms of life-sustaining treatment:

> Once one enters the realm of complex, high-technology medical care, it is hard to shed the "emotional symbolism" of food. However, artificial feedings such as nasogastric tubes, gastrostomies, and intravenous infusions are significantly different from bottle-feeding or spoonfeeding—they are medical procedures with inherent risks and possible side effects, instituted by skilled healthcare providers to compensate for impaired physical functioning. Analytically, artificial feeding by means of a nasogastric tube or intravenous infusion can be seen as equivalent to artificial breathing by means of a respirator. Both prolong life through mechanical means when the body is no longer able to perform a vital bodily function on its own.

---

system," that Hilda Peter stated "when it's time to die and God wants to take me, I never want to linger around" like my mother. "I never want to be kept alive"; that Hilda Peter often said she would rather be dead than live like a vegetable, that "[you're] not living when you're being kept alive"; and that Hilda Peter said, "I never want to suffer, nor do I want heroic measures to extend my life."

Furthermore, while nasogastric feeding and other medical procedures to ensure nutrition and hydration are usually well tolerated, they are not free from risks or burdens; they have complications that are sometimes serious and distressing to the patient. Nasogastric tubes may lead to pneumonia, cause irritation and discomfort, and require arm restraints for an incompetent patient. The volume of fluids needed to carry nutrients itself is sometimes harmful.

Finally, dehydration may well not be distressing or painful to a dying patient. For patients who are unable to sense hunger and thirst, withholding of feeding devices such as nasogastric tubes may not result in more pain than the termination of any other medical treatment. Indeed, it has been observed that patients near death who are not receiving nourishment may be more comfortable than patients in comparable conditions who are being fed and hydrated artificially. Thus, it cannot be assumed that it will always be beneficial for an incompetent patient to receive artificial feeding or harmful for him not to receive it. [*Conroy, supra,* 98 *N.J.* at 372–74 (citations omitted).]

*Accord Bouvia v. Superior Ct.,* 179 *Cal.App.*3d 1127, 225 *Cal.Rptr.* 297 (Ct.App.), review denied (June 5, 1986); *Barber v. Superior Court,* 147 *Cal.App.*3d 1006, 1016–17, 195 *Cal.Rptr.* 484, 490 (Ct.App.1983); *Corbett v. D'Alessandro, supra,* 487 *So.*2d at 371; *Brophy v. New England Sinai Hosp., supra,* 398 *Mass.* 417, 497 *N.E.*2d 626.

Medical authorities also hold that artificial feeding may be declined like other forms of life-sustaining medical treatment:

Even if death is not imminent but a patient's coma is beyond doubt irreversible and there are adequate safeguards to confirm the accuracy of the diagnosis and with the concurrence of those who have responsibility for the care of the patient, it is not unethical to discontinue all means of life prolonging medical treatment.

*Life prolonging medical treatment includes medication and artificially or technologically supplied respiration, nutrition or hydration.* [Opinion of the American Medical Association Council on Ethical and Judicial Affairs [10] (March 15, 1986) (emphasis added).]

*Accord President's Commission Report, supra,* at 3, 190, 288; *Policy Statement of the New Jersey State Board of Medical Examiners on Decisions to Withhold or Withdraw Medical Treatment* (July 1986); *New Jersey Chapter of American College of Physicians Executive Council Policy Statement on*

[10]This Council has final authority to issue binding opinions regarding ethical matters. Its opinions are not reviewable by the AMA's governing body, the House of Delegates.

*Care of Irreversibly Ill Patients* (Oct. 16, 1986); Los Angeles County Medical and Bar Associations, *Principles and Guidelines Concerning the Foregoing of Life Sustaining Treatment for Adult Patients* (Jan. 6, 1986); *Resolution of the Massachusetts Medical Society* (July 17, 1985); Medical Society of Milwaukee County, *Withdrawal of Nutrition and Hydration in Terminal Adult Patients* (1985).

We specifically reject the Ombudsman's distinction that the withdrawal of artificial feeding directly causes death while the withdrawal of other forms of life-support only indirectly causes death. Just as a patient does not die because of the withdrawal of a kidney dialysis machine, but because his underlying disease has destroyed the proper functioning of his kidney, so Hilda Peter will not die from the withdrawal of the nasogastric tube, but because of her underlying medical problem, *i.e.*, an inability to swallow. Withdrawal of the nasogastric tube, like discontinuance of other kinds of artificial treatment, merely acquiesces in the natural cessation of a critical bodily function. The cessation is the cause of death, not the acquiescence. *See* N. Cantor, *Legal Frontiers of Death and Dying* 38–45 (1987).

Accordingly, we reaffirm our conclusion in *Conroy* that there is no objective [11] distinction between withdrawal or withholding of artificial feeding and any other medical treatment. Competent and incompetent patients "have the right to decline any medical treatment, including artificial feeding...." *Conroy, supra*, 98 *N.J.* at 374.

## V

In every medical situation, the patient's condition and prognosis must be fully understood before any treatment decisions can

---

[11]If a patient subjectively distinguishes among various forms of life support, of course, that distinction will be respected. There is no evidence that Hilda Peter ever distinguished between artificial feeding and other medical treatment.

be made. *See generally* Otten, *Ethics Experts Help More Doctors Handle Hard Medical Decisions,* Wall St.J., Mar. 6, 1987, at 1, col. 1, 15, col. 3–4 ("Often the problem is less one of applying ethical concepts than one of finding out the facts."). Under *Quinlan,* if Hilda Peter were in a hospital, its prognosis [12] committee would verify the basis of any decision to forgo treatment that her guardian made in response to a prognosis of persistent vegetation. *See Quinlan, supra,* 70 *N.J.* at 54. Unfortunately, because Ms. Peter is in a nursing home, there is no prognosis committee.[13]

We recognize that elderly nursing home patients in the persistent vegetative state are threatened by the same conditions that put patients like Claire Conroy at risk, *i.e.,* an uneven level of care, minimal medical supervision, and frequent lack of family support. *See Conroy, supra,* 98 *N.J.* at 374–77. Accordingly, the Ombudsman, in consonance with his statutory mandate, must be given the opportunity to investigate and prevent any possible mistreatment of elderly nursing home patients who have been declared to be in a persistent vegetative state. Therefore, before life-sustaining treatment is withdrawn or withheld from such a patient, the surrogate decisionmaker should inform the Office of the Ombudsman for the Institutionalized Elderly that a decision to forgo treatment has been made. The Ombudsman should secure two independent medical opinions to confirm the patient's medical condition, the medical

---

[12]Because it is more descriptive, we refer to the consultative body of a hospital that should confirm an attending physician's diagnosis of persistent vegetation as a "prognosis," rather than an "ethics," committee. *Compare Quinlan, supra,* 70 *N.J.* at 54, *with Conroy, supra,* 98 *N.J.* at 375.

[13]There appears to be a trend toward integration of acute-care and long-term medical institutions. *See* Whitlow, *Jersey Hospitals Move Into Nursing Home Area,* Newark Star Ledger, January 11, 1987, at 1, 26. In cases where such an integration occurs the nursing homes should consider an affiliation with the prognosis committee of the hospital. The Department of Health also might consider the feasibility of developing regional prognosis committees for nursing homes.

alternatives available, the risks involved, the likely outcome if medical treatment is discontinued and that there is no reasonable possibility of the patient's recovery to a cognitive, sapient state.

If there is clear and convincing evidence that a patient has designated a family member or close friend to make surrogate medical decisions, upon receipt of the two medical confirmations the Ombudsman should defer any decisions concerning life-support to the designated decisionmaker. In the absence of a designated decisionmaker, if there is a close family member, upon receipt of two medical confirmations the Ombudsman should defer decisions about life-support to the family member. Thus, the Ombudsman must consult with the health care providers and treating physician, if there is one, to ascertain whether there is a close caring family member who will be able and willing to make such decisions. *See In re Jobes, supra,* 108 *N.J.* at 419 ("Normally those family members close enough to make a substituted judgment would be a spouse, parents, adult children, or siblings.").

We recognize that many elderly nursing home patients do not have any close family members and even if they do, the relatives may not be able to adequately represent the patient's interests. Usually in such a case a guardian will have to be appointed. We realize that in some cases health-care professionals will identify a close friend rather than a relative as the person who cares most about the patient. Nevertheless, in the absence of a specific designation by the patient that the close friend should make surrogate medical decisions on his or her behalf, we require that a guardian be appointed. *See In re Jobes, supra,* 108 *N.J.* at 420.

VI

To summarize our holding on surrogate decisions to withdraw or withhold life-sustaining medical treatment (including artificial feeding) from an elderly nursing home patient in a persistent vegetative state: If such a patient leaves clear and

convincing evidence of his or her medical preference, we apply the guidelines and procedures of the *Conroy* subjective test, and respect the patient's choice, regardless of his or her life-expectancy. We do not apply the *Conroy* objective or limited-objective tests. If a persistently vegetative patient's attitude toward life-sustaining treatment is not clear, we rely on the guidelines and procedures that we established in *Quinlan* and elaborated today in *Jobes*. *See In re Jobes, supra,* 108 *N.J.* at 420–424. The Ombudsman's oversight, the two independent medical opinions, and the appointment of a guardian in the absence of a close family member or a specifically designated surrogate decisionmaker offer sufficient protection against "decisions that make death too easy and quick as well as those that make it too agonizing and prolonged." *President's Commission Report, supra,* at 23.

"We recognize, as we did in *Conroy,* and as have numerous other courts, that given the fundamental societal questions that must be resolved, the Legislature is the proper branch of government to set guidelines in this area." *In re Farrell, supra,* 108 *N.J.* at 341. But until the Legislature acts, patients, their families and health care professionals must look to the courts for the guidelines under which life-sustaining medical treatment may be withdrawn or withheld. *Id.* at 343; *See In re Jobes, supra,* 108 *N.J.* at 446 (Handler, J., concurring). We emphasize that in this as in every case, the ultimate decision is not for the Court. The decision is primarily that of the patient, competent or incompetent, and the patient's family or guardian and physician.

Accordingly, we remand the case to the Ombudsman for reconsideration of the Guardian's application in accordance with this opinion.

HANDLER, J., concurring.

I join in the majority's reasoning and conclusion. Additional reasons for my concurrence in the Court's opinion are reflected in my separate opinion in *In re Jobes,* 108 *N.J.* 394, 428 (1987).

This case, and the *Jobes* case, involve treatment decisions on behalf of incompetent patients based substantially, if not exclusively, upon the standard of individual self-determination. This case, however, foreshadows the difficulties that will be posed when a self-determination basis for a treatment decision on behalf of the incompetent is lacking. We have suggested, *Matter of Conroy*, 98 *N.J.* 321, 364–68 (1985), and I have emphasized, *id.* at 391–99 (Handler, J. concurring in part and dissenting in part); *Jobes, supra,* 108 *N.J.* at 435–37 (Handler, J., concurring), that the treatment decision in that context will have to be supplemented or supplanted by objective factors relating to the condition of the patient. As I indicate in my opinion in *Jobes,* there will be cases in which the facts conducing to the decision to discontinue treatment will be compelling. *Jobes, supra,* 108 *N.J.* at 442–44 (concurring opinion). There will, however, be cases in which objective factors will not militate in favor of a decision to discontinue treatment. This case could have been one, because the facts relating to Hilda Peter's physical condition arguably do not show, as they forcefully do in the *Jobes* case, the physical extremes under which the burdens of continued artificial perpetuation of rudimentary life are in conflict with elemental notions of individual dignity and humanity.

I am, nevertheless, satisfied to join the Court's opinion. The treatment decision Mr. Johanning seeks to make in the name of Ms. Peter effectuates, if imperfectly, her right of self-determination. Ms. Peter's granting of a durable power of attorney to Mr. Johanning, combined with the fact that he was a close friend to Ms. Peter, is sufficient evidence that the treatment decision made for Ms. Peter now that she is incompetent is one with which she would have been content. *See Conroy, supra,* 98 *N.J.* at 361. *See generally Jobes, supra,* 108 *N.J.* at 439 n. 10 (Handler, J., concurring).

O'HERN, J., dissenting.

In this case, unlike that of Kathleen Farrell, there is no moral, medical, or ethical consensus that a surrogate decision-

maker may elect to discontinue the nurture of an incompetent patient deemed incapable of regaining any semblance of her former life. None of us would want to experience the anguish of choice that families in this situation must suffer. The question is, what is our role as a court in shaping or reflecting that societal consensus?

Why exactly are we asked to intervene at all? As the majority has correctly noted, death and dying are not strangers to our history. We are asked to intervene now because science has forced medical choices upon us that we have yet fully to resolve in the context of our values. *In re Farrell*, 108 *N.J.* 335, 341 (1987).

What then should be the role of law in resolving these choices? All agree that within appropriate confines self-determination is a value held paramount in our culture and law. We each should have the right to face inevitable and imminent death in the manner that is most consistent with our beliefs in our dignity as humans and perhaps more. But it is another thing to determine for others how and when they shall meet death. There are many lives that some consider not worth living. Whom shall we entrust to make that judgment for another, and by what standards?

I.

When law allows the termination of lives that are deemed no longer worth living, it must carefully consider its role in the exercise of that power. We recently had occasion to consider that role in *In re Conroy*, 98 *N.J.* 321 (1985). There we outlined the standards for discontinuance of life-sustaining treatment in the case of a terminally ill nursing home patient facing death due to failure of major bodily functions. In the absence of the patient's expressed wish, we held that if there is some trustworthy evidence that the patient would refuse the treatment, and it is clear to the substitute decision-maker that the treatment in question would merely prolong the patient's

suffering, then that treatment can be foregone. *Id.* at 365. However, we said that it must be found that the burdens of treatment, in terms of prolonging or causing pain and suffering, markedly outweigh whatever benefits the patient might derive from the treatment. *Ibid.*

When there is no evidence of the patient's wishes regarding terminal care, the test focuses entirely on evaluating the burdens to the patient. The surrogate must find that the net burdens of the patient's life with treatment clearly and markedly outweigh the benefits that the patient derives from life, and that the presence of recurring, unavoidable, and severe pain for the patient undergoing treatment makes administering the treatment inhumane. *Id.* at 366.

The overarching themes of *Conroy* were abhorrence of any measure of the quality of life, insistence upon the intrinsic value of the patient's dignity as a member of the human community, and a guiding principle premised upon a fundamental rule of medicine: do not harm the patient. Under this rule, neither a patient faced with inevitable and imminent death in spite of the life-support means used, nor the patient's family, need prolong the suffering occasioned by the use of that means to no human purpose.

I recognize the difficulty of applying these principles in the case of comatose patients, particularly with respect to the experience of pain. But I believe that we need not yet abandon the *Conroy* principles on the premise that a patient in a profoundly disturbed mental state will not or does not experience pain as we know it. There are objective manifestations of detrimental treatment. Moreover, I have been unable to draw a significant qualitative difference between a patient such as Claire Conroy, who was legally incompetent and unable to swallow, control her bowels, speak, or move from a fetal position, and one such as Hilda Peter, who has major neurological impairments, is unable to swallow reliably and therefore

requires a nasogastric tube for sustenance, but who "is without any hope of recovery."

Our understanding of human consciousness is limited by the extent of our own knowledge. We are informed that the only thing known with certainty about severely brain-damaged patients is that the patient cannot communicate with the outer world. It is not known what communications the patient can receive. I am not prepared to accept the description cited to us of one expert that the patient "is a plant." Has anyone ever seen a nursing professional who did not treat a comatose patient with the deepest respect? Why do we speak to, comfort, and hold such patients? Because we realize that they are no less human than we, even though they are unable in any way to express that humanity. They are not the people that we knew, but they remain the people that we love. In the cases before us, it is undoubtedly that love that deeply moves the parties.

Thus, there is no occasion to question the values that a contrary set of principles implies. The important thing to recognize is that the choice of such principles is value laden. Try as we might, it is impossible to separate the procedure that we sanction from the substantive standard. In *In re Quinlan*, 70 *N.J.* 10, *cert. denied sub nom. Garger v. New Jersey*, 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976), the Court was conscious that it was furnishing a substantive standard when it said that "[d]eterminations as to these [underlying human values and rights] must, in the ultimate, be responsive not only to the concepts of medicine but also to the common moral judgment of the community at large. In the latter respect the Court has a non-delegable judicial responsibility." *In re Quinlan, supra*, 70 *N.J.* at 44. I believe that Court was strengthened in its declaration of that "common moral judgment of the community," which would not "inhibit [physicians'] independent medical judgments for the well-being of their dying patients," *id* at 49, in the context of the "development by advanced technology of sophisticated and artificial life-sustaining de-

vices," *id.* at 48, because it recognized that, at least in part, such decisions reflected "the present standards and practices of many people engaged in medical care who have been doing what the parents of Karen Ann Quinlan are requesting authorization to have done for their beloved daughter." *Id.* at 33 (citation omitted). It is not necessary now to resolve whether the law was following the social ethic in *Quinlan* or whether it preceded it. "Not every case would implicate only ethical issues as to which there could be said to be such a societal consensus." Baron, "Medicine and Human Rights: Emerging Substantive Standards and Procedural Protections for Medical Decision Making Within the American Family," 17 *Fam.L.Q.,* 1, 15 (1983) (Baron). The important point to remember is that the decision states a substantive principle.

I do not yet sense that same degree of confidence that the "common moral judgment of the community at large," *In re Quinlan, supra,* 70 *N.J.* at 44, is that nurture and life support may be withdrawn from profoundly disabled patients. Thirteen new living will statutes enacted by other states last year included a prohibition against withholding or withdrawing of artificial nutrition and hydration from terminally-ill patients. Beatty, "Artificial Nutrition and the Terminally Ill: How Should Washington Decide?," 61 *Wash.L.Rev.* 419, 421–22 (citations omitted) (1986). Any decision allowing one group of people to withhold food and water from another human being evokes a response deep beneath the abstractions of legal reasoning. How does a court resolve a lawsuit whose dimensions transcend the law?

I recognize that the *Conroy* standard does not represent the final word. Indeed, we urged the Legislature to consider alternatives. As the Court notes in *Farrell, supra,* 108 *N.J.* at 342 n. 2, a legislative commission is actively studying these issues. As we await further resolution, the value of the *Conroy* resolution lies in its conformance with traditional legal concepts of *expressed* intent *and objective* burdens of pain and injury, not the subjective evaluation of when another's life is not worth

living. Its circumspection reflects the more familiar role of a court than of a legislative body. Comparable efforts to develop standards for refusal of lifesaving efforts for disabled newborns have focused on the effects of the treatment—is it of no value, will it inflict pain? Smith, "Disabled Newborns and the Federal Child Abuse Amendments: Tenuous Protection," 37 *Hastings L.J.* 765, 787 (1986).

Although these cases come to the Court in the regrettable but unavoidable glare of publicity, they invoke the historic *parens patriae* jurisdiction of the court. *Quinlan, supra,* 70 *N.J.* at 44. Each of these patients has presented herself to us through her family or friends as a ward of the court. The Court poses the substantive legal question in terms of whether the decisionmaker can be expected to act in the ward's interest. None would doubt that a family member would have anything but the best interests of the ward in mind. Yet, we characteristically circumscribe the guardian's role in matters as mundane as the investment of property. In any individual case, a guardian's decision less restricted might better advance the ward's interest, but the collective experience of courts has been to avoid any possibility of harm by the establishment of standards. So too here, a guardian's decision contrary to an objective standard would not in any sense be considered against the interests of the ward, but would exceed the restraints that the law has deemed necessary in its broader role.

So viewed, the *Conroy* decision represents an effort by the Court to develop substantive standards for surrogate decisions concerning patient care which can be measured by traditional legal principles.

## II.

Application of these principles to the facts of this case would lead me not to disturb the judgment of the Ombudsman for the Institutionalized Elderly. In his view, Hilda Peter was not a patient in the category of Claire Conroy, who was facing an

imminent death. With Hilda Peter's prognosis, the Ombudsman would not withdraw the nutrition or hydration, which had not been shown to cause her any suffering. His view of the evidence was that there was insufficient evidence to satisfy the purely subjective test of *Conroy.* On each of his judgments there was at least a sufficient factual basis in the record to sustain his decision. Traditional rules of review of agency action do not call for a displacement of that judgment.

As noted, I recognize that the *Conroy* formulation is undoubtedly not the best or only solution to this complex human problem. The question is whether we should now change the objective standard of *Conroy* to the more subjective evaluation of individual worth. As noted by Justice Schreiber, the Legislature undoubtedly is equipped far better than we to resolve these issues. *Conroy, supra,* 98 *N.J.* at 344. Even in the awesome context of state-authorized extinguishment of human life, we recently expressed our hesitancy to establish ourselves as the arbiters of society's moral values. *State v. Ramseur,* 106 *N.J.* 123 (1987). "It is not for this Court to pass on the wisdom or the ultimate morality of the death penalty. That issue is for the Legislature and the Governor, and for them alone." *Id.* 98 N.J. at 331.

We have come a long way in our society from the Holmesian dispatch of fundamental rights by aphorism. *Compare Buck v. Bell,* 274 *U.S.* 200, 47 *S.Ct.* 584, 71 *L.Ed.* 1000 (1927) (mentally impaired may be sterilized to prevent society from being "swamped with incompetence"), *with In re Grady,* 85 *N.J.* 235 (1981) (mentally impaired have constitutional rights both to sterilization and to procreation). Our law now expresses a uniform respect for the most deeply disabled members of our community. *New Jersey Ass'n for Retarded Citizens, Inc. v. New Jersey Dep't of Human Serv.,* 89 *N.J.* 234 (1982). Such patients enjoy the special protection of both federal and state law. *See,* Rehabilitation Act of 1973, § 504, 29 *U.S.C.A.* § 794; *N.J.S.A.* 30:4–165.1 to –165.11; Ombudsman for the Institutionalized Elderly, *N.J.S.A.* 52:27G–1. The majority's process-based

decision evokes Justice Handler's emphasis on "all concerns and values that have a legitimate bearing on the decision," *Conroy, supra,* 98 *N.J.* at 392 (concurring in part, dissenting in part), which is "precisely the broad quality-of-life standard that the majority in *Conroy* thought it was rejecting." Destro, "Quality-of-Life Ethics and Constitutional Jurisprudence: The Demise of Natural Rights and Equal Protection for the Disabled and Incompetent, 2 *J.Contemp.Health & Law Prob.* 71, 111 (1986).

Although in some cases we have awaited legislative formulation of standards to vindicate important rights, *Hills Dev. Co. v. Township of Bernards,* 103 *N.J.* 1, 47 (1986), it may be that we cannot avoid setting the substantive standard in these cases. In a society of diverse views, the Legislature may be unable to reach any majoritarian judgment. At that time we might all agree on a standard.

As difficult as these cases are, they require "for the deciding of these very important questions the special qualities of process that characterize the ideal of our courts and give empirical content to the concept of 'the rule of law.'" Baron, *supra,* at 20 (citation omitted). And as painful as the publicity is, the cases provoke "continuing and widespread public dialogue. Gradually, such dialogue may develop lines of consensus regarding societal values upon which the courts can draw." *Id.* at 22. The enduring value of the judicial system is its openness —"its tendency to protect all elements of the process from serious erosion." *Ibid.* We will all be the better for having the process remain open.

We cannot, however, as I have said, fail to recognize when we set standards. When a court "allows such [life-ending] decisions," and "circumscribes the practice (to safeguard well-being)," and "shapes social institutions," President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavorial Research, *Deciding to Forego Life-Sustaining Treatment* 30 (1983), it makes a profound statement. The Court wishes that it were not so. It believes: "[I]n this as in

every case, the ultimate decision is not for the Court. The decision is primarily that of the patient, competent or incompetent, and the patient's family or guardian and physician." *Ante* at 385. I respect the fact that the Court wishes not to intrude in this area of intense personal privacy and suffering. It is not possible, however, to adopt neutral principles. Implicit in every such decision of this Court is a statement that transcends not only the case before the Court, but the boundaries of this jurisdiction. It is only two terms since we decided Claire Conroy's case. It is sometimes forgotten that on a record in that case similar to the one at bar, we concurred in the reversal of the judgment that would have discontinued feeding her. Therefore, I respectfully dissent.

CLIFFORD, HANDLER and POLLOCK, JJ., concurring in the result.

*For remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN—6.

*Opposed*—Justice O'HERN—1.