259 N.J. Super. 193 (1992)
611 A.2d 1148
IN THE MATTER OF ALICE HUGHES.
Superior Court of New Jersey, Appellate Division.
Argued March 25, 1992.
Decided August 31, 1992.
*194 Before Judges KING, DREIER and GRUCCIO.
*195 Carl Ahrens Price argued the cause for appellant Alice Hughes.
Gary J. Lesneski argued the cause for respondent Cooper Hospital/University Medical Center (Archer & Greiner, attorneys; Gary J. Lesneski, of counsel; Betty S. Adler, on the brief).
Donald T. Ridley, member of the New York bar admitted pro hac vice, argued the cause for amicus curiae Watchtower Bible and Tract Society.
The opinion of the court was delivered by GRUCCIO, J.A.D.
On May 13, 1991, Alice Hughes (Ms. Hughes), a 39-year-old devout Jehovah's Witness, was admitted to Cooper Hospital/University Medical Center to undergo a hysterectomy. A principal tenet of the Jehovah's Witness faith is the belief that receiving blood or blood products into one's body precludes resurrection and everlasting life after death.
At the time of her admission to the hospital, Ms. Hughes signed forms expressing her desire not to receive any blood or blood products. She also verbally expressed this intention to her treating physician, Dr. Isadore Ances.
Unanticipated problems arose during surgery which, in Dr. Ances' opinion, required blood transfusions to save Ms. Hughes' life. Dr. Ances contacted Jimmy Hughes, Ms. Hughes' husband, to discuss the emergency situation and his wife's vital need for blood. While on the phone Mr. Hughes, also a Jehovah's Witness, authorized transfusions.
Cooper Hospital initiated an emergency hearing before Judge Fratto at 1:37 a.m. on May 14, 1991, for the purpose of having a temporary guardian appointed for Ms. Hughes to allow additional transfusions after the surgery. She was unconscious and incapable of expressing her desires at the time. Appearing at the emergency hearing were Dr. Ances, Jimmy Hughes, *196 Laura Bennett (Ms. Hughes' sister), and Alinda Ross (Ms. Hughes' daughter).
Specific testimony was given by Dr. Ances regarding his communications with Ms. Hughes, who had been his patient for a mere six weeks. He testified that Ms. Hughes told him that she was a Jehovah's Witness and that she did not want blood products. He informed her that a time could arise when blood might be needed to save her life. He also told her that, given the procedure and the size of her uterus, it was unlikely that she would need blood during the surgery. Ms. Hughes did not discuss the depth of her religious convictions with Dr. Ances, although he was aware that she had signed hospital forms refusing blood. Dr. Ances told the judge that he assumed Ms. Hughes was aware of the ramifications of refusing blood and therefore did not specifically discuss them with her.
Jimmy Hughes testified that his wife is a very religious person and expressed her desire to refuse blood, even in an emergency. He further stated that he initially authorized the transfusions by telephone because he was upset and far from home when told that his wife could die without them. When asked whether blood should still be refused, he would not answer.
Laura Bennett, Ms. Hughes' sister, testified that she discussed her religious beliefs with Ms. Hughes before the surgery and believed that she would not want a blood transfusion. She said that Ms. Hughes told her that under no circumstances was she to receive blood. In her opinion, Ms. Hughes understood the consequences of not receiving blood and made a fully-informed decision.
Ms. Hughes' teenage daughter, Alinda Ross, also testified that her mother told her she would not want to receive blood. Yet, Alinda voiced concern about her mother's death and whether any blood substitutes could be given.
After hearing testimony from Dr. Ances and Ms. Hughes' family, the judge found that the evidence was unclear as to *197 whether she would want blood or blood products if it meant saving her life. As a result, the judge appointed the hospital's risk manager as temporary guardian for the limited purpose of giving consent to the administration of blood and blood products. The order explicitly extended only until Ms. Hughes regained consciousness and became competent to make her own decisions regarding the administration of blood. The order automatically expired upon her discharge from the hospital. Thereafter, Ms. Hughes received blood transfusions and recovered. Upon regaining competency, she withdrew the hospital's right to transfuse blood.
On June 28, 1991, Ms. Hughes filed an appeal from the judgment. On September 24, 1991, the hospital filed a motion to dismiss for mootness, which was denied on October 21, 1991, pending full argument. Watchtower Bible and Tract Society filed an amicus curiae brief and its counsel was granted pro hac vice admission for oral argument. Ms. Hughes does not seek damages on appeal, but requests this court to reverse the emergency judgment authorizing a temporary medical guardian, on grounds of public policy.
Although the controversy before the court is moot, since Ms. Hughes received the disputed blood transfusions and has since recovered, public interest warrants a resolution of the underlying issue. Div. of Youth & Fam. Serv. v. J.B., 120 N.J. 112, 576 A.2d 261 (1990); Falcone v. De Furia, 103 N.J. 219, 226, 510 A.2d 1174 (1986); State v. Perricone, 37 N.J. 463, 469, 181 A.2d 751, cert. den., 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962). We must decide whether Ms. Hughes' desire not to receive blood was clearly expressed prior to her surgery and should have been upheld under the circumstances.
We begin our analysis with an historical overview of Jehovah's Witnesses and their prohibition of blood transfusions. In matters of health and medical care, the Witnesses recognize the Lord God Jehovah as the source of life and view their lives as a gift from God. Psalm 36:9. While the Witnesses freely seek *198 medical care, they obey the scriptural directive in "abstaining ... from blood." Acts 15:28, 29.
Since ancient times, human and animal blood have been used in the treatment and recuperation of various diseases. Bernard Seeman, The River of Life 53-59 (1961). Blood was thought to have therapeutic or nutritional attributes and it was believed that drinking blood would inspire courage. Piet Hagen, Blood: Gift or Merchandise 11 (1982).
Yet, despite a long history of blood use for these purposes, the Witnesses point to a time when people obeyed God's law on blood. When God created Adam and Eve, He gave them all vegetation as food, but warned that animal flesh (and therefore blood) was not intended as food. Genesis 1:28-30. By the time of Noah, God allowed man to eat animal flesh, but the consumption of animal blood was still forbidden. Genesis 9:14. The prohibition of blood is also found in Mosaic Law. Leviticus 17:1, 2, 10-12. In the first century, the first council of the newly-established Christian church reinforced the prohibition and announced the decision to maintain abstinence from blood. Acts 15:29, 29; 21:25. Thus, from the time of Noah, through the Law of Moses, and again with the newly-formed Christian congregation in the first century, Jehovah consistently commanded those serving Him to "abstain from blood."
The conclusion of World War II saw the widespread use of transfused blood in civilian medical practice, and once again the Witnesses' view of the proper use of blood was reviewed. The Witnesses concluded that the worshippers of Jehovah who seek eternal life must respect the sanctity of blood. The Watchtower, July 1, 1945, at 201. Since that time, the Witnesses' perspective on blood transfusions has remained steadfast. The Witnesses are also aware of the many hazards and complications accompanying transfusion therapy, which has strengthened their conviction about the benefits of heeding God's word.
"The right of a person to control his own body is a basic societal concept." Although complete control of one's mortality *199 is currently a hotly debated topic, the decision of a Jehovah's Witness to refuse blood should not be viewed as an exercise of a "right to die". In re Conroy, 98 N.J. 321, 346, 486 A.2d 1209 (1985). The doctrine of informed consent was developed to protect the right of self-determination in matters of medical treatment. Id. at 346-348, 486 A.2d 1209. Self-determination encompasses the right to refuse medical treatment and is a right protected by common law as well as by the federal and state constitutional right to privacy. Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261, 281-82, 110 S.Ct. 2841, 2852-53, 111 L.Ed.2d 224, 244-45 (1990); In re Quinlan, 70 N.J. 10, 38-42, 355 A.2d 647, cert. den. sub nom., Garger v. New Jersey, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976); Conroy, supra, 98 N.J. at 348, 486 A.2d 1209.
Our Supreme Court has repeatedly addressed the right to decline medical treatment in situations where the patient is opposed to prolonging an otherwise irreversible condition. See In re Farrell, 108 N.J. 335, 529 A.2d 404 (1987); In re Jobes, 108 N.J. 394, 529 A.2d 434 (1987); In re Peter, 108 N.J. 365, 529 A.2d 419 (1987); In re Conroy, 98 N.J. 321, 486 A.2d 1209 (1985); In re Quinlan, 70 N.J. 10, 355 A.2d 647 (1976). The distinguishing factor in this case is that the transfusion can preserve a healthy young woman's life, not prolong a painful and imminent death.
While it is clear that a competent patient has the right to refuse life-sustaining medical treatment, she must also have a clear understanding of the nature of the illness and prognosis; the risks and benefits of the proposed treatment, and the capacity to analyze that information in order to exercise this right. In re Farrell, supra, 108 N.J. at 354 n. 7, 529 A.2d 404. When the patient is incompetent, a surrogate decision-maker may assert the patient's rights of self-determination and privacy. In re Peter, supra, 108 N.J. at 377-78, 529 A.2d 419; In re Conroy, supra, 98 N.J. at 368, 486 A.2d 1209.
*200 Indeed, the Pennsylvania Supreme Court affirmed a trial judge's decision to appoint a temporary guardian to consent to blood transfusions when a patient is unconscious. The court reasoned that medical intervention necessary to preserve life requires nothing less than a "fully conscious contemporaneous decision by the patient...." In re Estate of Darone, 349 Pa.Super. 59, 502 A.2d 1271 (1985), aff'd, 517 Pa. 3, 534 A.2d 452, 455 (1987). On the other extreme, however, lies the perspective of the Canadian court which awarded battery damages against a doctor who performed an emergency blood transfusion. The patient carried a card in her wallet stating she was a Witness and was not to receive blood under any circumstances. Malette v. Shulman, 72 O.R.2d 417 (Ont.Ct.App. 1990).
In New Jersey, the decision-maker must determine and effectuate, insofar as possible, the decision that the patient would have made if competent. In re Conroy, supra, 98 N.J. at 360, 486 A.2d 1209. An objective standard is not employed to make this determination, but rather the court must consider what the particular patient would have done if able to choose. Id. at 360-361, 486 A.2d 1209.
Any information bearing on the person's intent may be an appropriate aid in determining what course of treatment the patient would have wished to pursue. This intent might be embodied in a living will; oral directives to family, friends and health care providers; a durable power of attorney; religious beliefs or tenets of a religion; or from the patient's consistent pattern of conduct with respect to prior medical decisions. Id. at 361-362, 486 A.2d 1209; see N.J.S.A. 26:2H-53 to -78 (the New Jersey Advance Directives for Health Care Act effective January 7, 1992).[1]
*201 The probative value of the evidence must also be considered, and may vary depending on remoteness, consistency and thoughtfulness of prior actions and statements. The maturity of the person at the time of the acts or statements must also be considered. In re Conroy, supra, 98 N.J. at 362, 486 A.2d 1209. Another factor affecting the probative value of a patient's prior statements is their specificity, since no one can accurately predict the precise circumstances one might ultimately face. Id. at 363, 486 A.2d 1209. A surrogate decision-maker should exercise "extreme caution" in determining the patient's intent and should not approve the withholding of treatment unless "manifestly satisfied" that the subjective standard has been met. Id. at 368, 486 A.2d 1209.
This subjective standard was held by our Supreme Court to be "applicable in every surrogate-refusal-of-treatment case, regardless of the patient's medical condition or life-expectancy." In re Peter, supra, 108 N.J. at 377, 529 A.2d 419. Under this standard, life-sustaining treatment may be withdrawn or withheld when there is clear and convincing evidence that if the patient were competent, she would decline the treatment. Id. at 377-378, 529 A.2d 419. Unless there is clear, convincing and unequivocal evidence of the incompetent patient's fully informed *202 decision, a court must rule "in favor of preserving life." In re Conroy, supra, 98 N.J. at 368, 486 A.2d 1209; see also Application of the President and Directors of Georgetown College, 331 F.2d 1000, 1009-1010 (D.C. Cir.), cert. den., 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964).
The present facts indicate that Alice Hughes specifically advised Dr. Ances and family members of her desire not to receive blood or blood products. She further directed the hospital and her doctor, in writing, to refrain from giving her a transfusion. Yet, some uncertainty remained as to what Ms. Hughes may have desired had she been competent and understood the gravity of the situation. Dr. Ances testified that although he was aware of Ms. Hughes' religious beliefs, they did not discuss the depth of her convictions. Further, Ms. Hughes' statements to him concerning her refusal of blood were made in the context of an impending hysterectomy  a procedure Dr. Ances advised would probably not require a transfusion. At no time did Ms. Hughes discuss with Dr. Ances the risk of complications during surgery or that she could bleed to death during an otherwise routine hysterectomy. Therefore, a doubt existed as to whether Ms. Hughes had made a fully informed and knowing decision to refuse blood if this meant her death.
The doubt is further evinced by Jimmy Hughes' initial authorization of transfusions. Although he testified at the hearing that his wife would not want blood, he initially authorized the transfusions. He also declined to answer when asked by the judge whether additional blood should be refused. Any glimmer of uncertainty as to Ms. Hughes' desires in an emergency situation should be resolved "in favor of preserving life." In re Conroy, supra, 98 N.J. at 368, 486 A.2d 1209. Given this scenario, we find that the judge did not err in appointing a temporary medical guardian.
However, while a competent Jehovah's Witness or person holding like views has every right to refuse some or all medical *203 treatment, even to the point of sacrificing life, the judge must make an appropriate finding that this is truly what the patient intended. The decision must be made with full knowledge of the ramifications. Should a patient decide, with full knowledge of the potential situation, to refuse life-sustaining medical treatment and the patient communicates this decision via clear and convincing oral directives, actions or writings, the patient's desires should be carried out.
An approach to reinforce a patient's wishes is to have the patient sign forms prior to medical treatment. These suggested forms should be distinguished from those signed by Ms. Hughes prior to her surgery. Here, she signed a standard hospital form entitled "Refusal to Permit Blood Transfusion," which used a "fill in the blanks" type approach. The form stated:
I REQUEST that no blood or blood derivatives be administered to Alice Hughes [typewritten on original form] during the hospitalization. I hereby release the hospital, its personnel, and the attending physician from any responsibility whatever for unfavorable reactions or any untoward results due to my refusal to permit the use of blood or its derivatives and I fully understand the possible consequences of such refusal on my part. The consequences of this refusal have been explained to me by ____.
Ms. Hughes and a witness signed the form, but there was no indication in the space provided that the consequences of her refusal had been explained to her in the context of this particular operation. In fact, Dr. Ances testified that he had not discussed the depth of her faith or the ramifications of a refusal of blood prior to the routine elective surgery.
These proposed forms must contain an unequivocal statement that under any and all circumstances, blood is not to be used and an acknowledgment that the consequences of the refusal were fully supplied to the patient. The form should fully release the physician, all medical personnel and the hospital from liability should complications arise from the failure to administer blood, thereby resolving any doubt as to the doctor's responsibility to his patient. If a patient refuses to sign such a *204 form, the doctor would then decide whether to continue with treatment or aid the patient in finding another physician.
We emphasize that the case before us arose in the context of elective surgery. This was not an emergency situation where the doctor and patient did not have time to fully discuss the potential risks of the surgery and the depth of the patient's religious beliefs. A Jehovah's Witness patient has an obligation to make medical preferences unequivocally known to the treating physician, including the course to follow if life-threatening complications should arise. This protects the patient's right to freedom of religion and self-determination, as well as the hospital's obligation to preserve life whenever possible.
Accordingly, we affirm the judge's emergency decision to appoint a temporary medical guardian for Ms. Hughes. Under the circumstances we find the decision legally supportable.
Affirmed.
NOTES
[1] N.J.S.A. 26:2H-63(c) and (d) set forth:

c. In acting to implement a patient's wishes pursuant to an advance directive, the health care representative shall give priority to the patient's instruction directive, and may also consider, as appropriate and necessary, the following forms of evidence of the patient's wishes:
(1) The patient's contemporaneous expressions, including nonverbal expressions;
(2) Other reliable sources of information, including the health care representative's personal knowledge of the patient's values, preferences and goals; and
(3) Reliable oral or written statements previously made by the patient, including, but not limited to, statements made to family members, friends, health care professionals or religious leaders.
d. If the instruction directive, in conjunction with other evidence of the patient's wishes, does not provide, in the exercise of reasonable judgment, clear direction as applied to the patient's medical condition and the treatment alternatives, the health care representative shall exercise reasonable discretion, in good faith, to effectuate the terms, intent, and spirit of the instruction directive and other evidence of the patient's wishes.