774 A.2d 551 (2001)
340 N.J. Super. 264
Woodrow HALL, by and through his guardian ad litem Sandra HALL, Sandra Hall, individually and as guardian ad litem of Carly Hall, Woodrow Hall Jr., and Ryan Hall, minors, Plaintiffs-Respondents/Cross-Appellants,
v.
Baltazar RODRICKS, M.D., Defendant-Appellant/Cross-Respondent, and
John Marstella, C.R.N.A., and Burdette Tomlin Memorial Hospital, Defendants, and
Robert Salasin, M.D., Defendant-Respondent.
Woodrow Hall, by and through his guardian ad litem Sandra Hall, Sandra Hall, individually and as guardian ad litem of Carly Hall, Woodrow Hall, Jr., and Ryan Hall, minors, Plaintiffs-Respondents/Cross-Appellants,
v.
Baltazar Rodricks, M.D., Defendant, and
John Marstella, C.R.N.A., and Burdette Tomlin Memorial Hospital, Defendants/Third-Party Plaintiffs/Appellants/Cross-Respondents, and
Robert Salasin, M.D., Defendant-Respondent, and
Thomas Scott, Alan Grip, Arthur Lefkoe, and Mary Fay, Defendants/Third-Party Plaintiffs,
v.
Michael S. Berger and The Law Offices of Michael S. Berger, Third-Party Defendants.
Superior Court of New Jersey, Appellate Division.
Argued March 26, 2001.
Decided April 30, 2001.
*552 A. Michael Barker, Linwood, argued the cause for defendant-appellant/cross-respondent *553 Baltazar Rodricks, M.D. in A-440-99T1.
Michael S. Berger, Haddonfield, argued the cause for Woodrow Hall, et al plaintiffs-respondents /cross-appellants in A-440-99T1 and A-444-99T1 (Andres & Berger, attorneys, Mr. Berger, of counsel; Kevin Haverty and Laura M. LeWinn, on the brief).
Donald Grasso, Toms River, argued the cause for defendant-appellant/cross-respondent Robert Salasin, M.D. in A-440-99T1 and A-444-99T1 (Orlovsky, Grasso, Bolger, Mensching & Halpin, attorneys, Mr. Grasso, of counsel; Colleen L. Brandt, on the brief).
Timothy M. Crammer, Pleasantville, argued the cause for defendants/third-party plaintiffs/appellants/cross respondents John Marstella, C.R.N.A., and Burdette Tomlin Memorial Hospital in A-444-99T1 (Paarz, Master, Koerning, Crammer, O'Brien, Bishop & Horn, attorneys; Mr. Crammer, on the brief).
Before Judges PETRELLA, NEWMAN and WELLS.
The opinion of the court was delivered by NEWMAN, J.A.D.
During surgery at defendant Burdette Tomlin Medical Center ("Burdette Tomlin"), plaintiff Woodrow Hall suffered a cardiac arrest and as a result remains in a persistent vegetative state. Plaintiffs[1] presented two theories of liability at trial: one, that defendants Baltazar Rodricks, an anesthesiologist, and John Marstella, a certified registered nurse anesthetist, failed to properly ventilate plaintiff during the surgery, and two, that Robert Salasin, a surgeon, failed to transfuse blood prior to surgery. The jury returned a verdict in favor of plaintiffs for $7,828,420 against Marstella and Rodricks, finding Marstella sixty percent at fault and Rodricks forty percent at fault. The jury found Salasin negligent, but did not find that his negligence was a proximate cause of the injury. Marstella and Burdette Tomlin, his employer, (referred to jointly as "defendants") and Rodricks have filed separate appeals from the same judgment. Plaintiffs have filed a cross-appeal, contending the court erred in dismissing their loss of parental consortium claim.
Defendants and Rodricks argue that the court erred in: 1) instructing the jury that failure to communicate was negligence, in failing to define the terms "medically significant" and "communication," and in charging a "one-sided" recitation of the facts; 2) permitting plaintiffs' and Salasin's experts to testify that Marstella and Rodricks had deviated from the experts' personal standards of care, as opposed to the established standards of care for an anesthesiologist and nurse anesthetist; 3) allowing testimony regarding Marstella's failure to set the alarms on the monitoring machines and failure to keep legible records; 4) admitting portions of a medical textbook under the learned treatise exception to the hearsay rule because the experts did not rely on the text in formulating their opinions for trial; 5) restricting their cross-examination of Salasin regarding bias; 6) instructing the jury to consider whether Salasin's conduct involved the exercise of judgment; 7) instructing the jury as to Rodricks's duty to supervise Marstella because the charge was not supported by substantial credible evidence and the language of the charge was erroneous; *554 8) instructing the jury that in assessing future medical expenses plaintiff had a right to be cared for at home; 9) awarding prejudgment interest on the future loss damages; and 10) limiting closing argument to one hour.
Defendants, but not Rodricks, also argue that: 1) the court erred in denying their application to dismiss juror number four after she commented that plaintiff's children were lovely; and 2) denying their motion for a change in venue.
Because of the commonality of issues, we consolidate the appeals for the purpose of this opinion. We affirm both the direct appeal of defendants and Rodricks and the cross-appeal of plaintiffs.
Since we are only publishing issues relating to damages, our discussion of the facts will be limited to the damages testimony and to the legal issues involving the jury instruction and plaintiff's right to be cared for at home in assessing future medical expenses and awarding prejudgment interest on the future loss damages.

I.
[At the court's direction, the facts relating to liability have been redacted for publication purposes.]
With regard to damages, it was undisputed that plaintiff was in a persistent vegetative state and needed daily medical care for all of his bodily functions, including feeding through a tube, and breathing by way of a tracheostomy tube. At the time of trial, plaintiff had been moved to Crest Haven Nursing Home in Cape May County. Michelle Grimmer, a registered nurse at the nursing home, testified that plaintiff was "healthy" and "very stable" and given his condition, had relatively few medical problems. She also testified that Sandra Hall visited plaintiff every day and took care of all his laundry and some of his basic hygiene needs. At the time of trial, plaintiff had incurred medical and nursing home bills totaling $743,855.14.
Sandra Hall testified that she wanted to care for plaintiff at home because he had previously expressed a desire not to be placed in that particular nursing home, and because it would be easier for her and the children to spend time with plaintiff. The Hall children, Carly, who was sixteen years old at the time of trial, Woody, who was thirteen years old at the time of trial, and Ryan, who was ten years old at the time of trial, also testified that they wanted plaintiff cared for at home.
Lorraine Buchanan, plaintiffs' expert rehabilitation nurse and life care planner, testified that plaintiff needed continuous care because he could not control his movements or bodily functions. That care could be provided by Sandra Hall and other medical support personnel at home, at a total cost of approximately $180,492.91 annually, which included $163,027.50 for medical and medical support expenses and $17,465.41 for equipment expenses. Buchanan admitted that home care cost twenty to forty percent more than nursing home care and that Crest Haven charged approximately $50,000 annually. However, she stated that Sandra Hall could decide where plaintiff would be cared for and that she had prepared his life care plan accordingly.
M. Elizabeth Sandel, plaintiffs' expert in rehabilitative medicine, testified via videotaped depositions, that plaintiff had a life expectancy of fifteen to twenty years.
Joel Posner, defendants' expert in the care and treatment of immobilized patients, testified that plaintiff had a life expectancy of two to five years, even though he admitted that at least two individuals in a persistent vegetative state had lived for thirty-seven and forty-one years respectively. He was of the opinion that it *555 was not medically reasonable or necessary for plaintiff to be cared for at home, although the choice of home or institutional care was the family's. He testified that plaintiff would incur expenses of approximately $55,000 annually in a nursing home and $110,000 for home care.
Roma Santaniello, plaintiff's prior employer, testified that plaintiff, as a cook, had earned $660 per week plus an annual $1000 bonus.
Finally, Robert Wolf, plaintiffs' expert vocational economist, opined that because of the need for liquidity, a relatively low-risk investment strategy should be pursued for the fund to be created to pay for plaintiff's future medical expenses. He explained that the return on an investment is proportional to the risk undertaken and generally the higher the risk the greater the rate of return. Wolf conceded that while a long-term investment strategy can absorb a greater risk, a fund, which requires liquidity because of the need for regular and frequent withdrawals, cannot. In that regard, he concluded that the expected rate of return on the fund would be approximately 4.8%, which was the expected rate of return for short-term government-guaranteed treasury notes.
Wolf maintained that the rate of inflation for health care costs exceeded the general rate of inflation by a factor of one-and-a-half, resulting in a six to seven percent rate of inflation. Thus, the inflation rate for health care costs would exceed the fair rate of return in this case. Nevertheless, Wolf adopted a "more conservative approach" and ultimately concluded that the interest rate would equal the inflation rate, resulting in a net discount rate of zero, or a "total offset."
Wolf conceded however, that a different discount rate would apply if the funds were invested in a balanced portfolio including securities, bonds, and treasury securities. For example, he admitted that assuming a ten to twelve percent rate of return on a balanced securities portfolio, and an inflation rate of six to seven-percent, the discount rate would be approximately five percent. Applying that discount rate to plaintiff's projected $180,492.91 in annual medical expenses resulted in a present value of $110,804 annually for a ten-year fund.
Wolf also admitted that recent investments in common stock had yielded in excess of a twenty percent rate of return, and that inflation had been 1.7% in 1998, and 1.9% in 1997. Additionally, he conceded that interest on a one-year certificate of deposit yielded 5.5%. Rodricks and defendants did not otherwise present any independent expert testimony on present value.
The jury returned a unanimous verdict finding that Rodricks and Marstella had deviated from accepted standards of medical practice, and that that deviation proximately caused plaintiff's injuries. The jury also found that Salasin had deviated from the accepted standards; however, the jury indicated that the vote was not by at least six jurors. After further deliberations, the jury returned with a six to one verdict finding that Salasin had deviated from the accepted standards, but by unanimous vote that the deviation had not proximately cause plaintiff's injuries. The jury allocated fault forty percent to Rodricks and sixty percent to Marstella, and awarded plaintiffs the following damages:

 1) Pain, suffering, disability,
 loss of enjoyment
 of life: $1,000,000
 2) Past medical expenses: $ 743,855
 3) Future medical expenses: $4,442,070
 4) Past lost wages: $ 103,000
 5) Future lost wages: $ 516,000
 6) Past loss of consortium: $ 43,500
 7) Future loss of consortium: $1,000,000
 __________
 TOTAL $7,828,425

*556 The court entered an order of judgment on July 6, 1999, which included a $1,422,620 prejudgment interest award.
On that same date, Rodricks moved for a judgment n.o.v. or a new trial. Defendants filed a similar motion on July 19, 1999. The court heard argument on the motions on August 10, 1999, and by order entered on that date, denied the motions, commenting as follows:
Any reviewing court should understand that this med-mal case against the anesthesia team is so strong that it should be considered the med-mal equivalent of a rear-end collision. If the jury had not found the anesthesia team negligent and a proximate cause, this court would have entered that judgment because any other finding against the anesthesia team would represent, in the court's mind, a miscarriage of justice.
We address the issues raised on appeal.
[At the court's direction, sections II through IX, XI through XIII, and XV through XVIII have been redacted for publication purposes.]
X.
Defendants and Rodricks argue that the court erred in instructing the jury that in awarding future medical expenses, plaintiff had a right to be cared for at home. They contend that the instruction improperly precluded the jury from considering and awarding expenses for institutional care.
Our Supreme Court in a right-to-die case, held that "[a] competent patient's right to exercise his or her choice to refuse life-sustaining treatment does not vary depending on whether the patient is in a medical institution or at home." In re Farrell, 108 N.J. 335, 354, 529 A.2d 404 (1987). The Court recognized that the law traditionally respects "the private realm of family life which the state cannot enter." Id. at 355, 529 A.2d 404 (quoting Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, 652 (1944)). In that regard the Court held:
We believe that this tradition of respect for and confidence in the family should ground our approach to the treatment of the sick. Whether a patient remains at home or not, therefore, should be the unencumbered decision of the patient and the patient's family with the advice of the doctor. Thus, we do not want to impose any restrictions or burdens on the competent patient's right to have life-sustaining treatment withdrawn if he or she is at home that would not be present if he or she were in a hospital or nursing home.
[Id. at 356, 529 A.2d 404.]
Moreover, a "constant goal" of our courts "is to insure that patients' medical preferences are respected." In re Peter, 108 N.J. 365, 377-78, 529 A.2d 419 (1987). "When the patient is incompetent, a surrogate decision-maker may assert the patient's rights of self-determination and privacy." In re Hughes, 259 N.J.Super. 193, 199, 611 A.2d 1148 (App.Div.1992).
It is clear that a party may recover the reasonable value of future medical services necessitated by a defendant's tortious conduct. Campo v. Tama, 133 N.J. 123, 129, 627 A.2d 135 (1993); Coll v. Sherry, 29 N.J. 166, 174, 148 A.2d 481 (1959). As previously noted, the law allows a guardian to decide whether a patient will be cared for at home. In that regard the trial court properly charged the jury that plaintiffs had the burden to prove "the reasonableness of the charge for future medical care" and that they should "determine the services and estimated expenses which are reasonable and necessary to provide care at the family home." To allow the jury to consider and award the *557 less expensive institutional care expenses would by financial necessity preclude Sandra Hall from exercising her right to take care of plaintiff at home. That decision, as in the analogous right-to-die cases, should not be encumbered. In re Farrell, supra, 108 N.J. at 356, 529 A.2d 404.
Plaintiffs are not entitled to every conceivable home care expense. Here, Buchanan detailed the medical services necessary for home care, including the need for continuous medical personnel and equipment, such as a hospital bed, van with modifications, wheelchair, hydraulic lift, catheters, tracheostomy tubes, and other necessary equipment. The jury was properly instructed to decide whether those expenses were reasonable and necessary. If plaintiffs had sought extravagant expenses the jury could have found those expenses not reasonable and necessary and rejected them. We are satisfied that the trial judge correctly charged the jury regarding future medical expenses.

XIV.
Rodricks argues that the court erred in instructing the jury that in determining future losses of enjoyment of life, wages, and consortium, it should disregard the expert testimony as to plaintiff's shortened life expectancy and instead consider plaintiff's pre-injury life expectancy of approximately thirty-four years, in accordance with the mortality table set forth at Pressler, Current N.J. Court Rules, Appendix I (2001).
Sandel testified that plaintiff had a post-injury life expectancy of fifteen to twenty years, and Posner claimed that plaintiff had a post-injury life expectancy of two to five years. Based on plaintiff's age at the time of trial, the mortality table set forth in Appendix I listed his pre-injury life expectancy as approximately thirty-four years.
In the charge conference, the court posited that to the extent plaintiff's shortened life expectancy was the result of defendants' negligence, it would affect the various elements of compensable damages differently. The court noted that the
[e]xperts say that [plaintiff] will live at most another 15 to 20 years or as little as two to three years. If this shortened life expectancy was caused by negligence, then this negligence deprived [plaintiff] of a great deal of his life expectancy. This stolen life expectancy should ... not deprive him of a fair and reasonable award in recovering monies for his disability, the loss of enjoyment of life, his loss of future wages, and for Mrs. Hall's claim for loss of services and consortium.
I'm going to advise the jury that they should not consider the expert testimony of the negligently produced lesser life expectancy when considering damages for [future losses].... I will advise them that the expert testimony can be considered when fixing an award for future medical bills.
Rodricks and defendants objected to the proposed charge on the basis that it allowed the jury to award damages "beyond the point of probable death."
The court charged the jury that with regard to future losses of enjoyment of life, wages, and consortium, they should "disregard" Sandel's and Posner's testimony regarding plaintiff's life expectancy and instead consider that plaintiff had a thirty-four-year life expectancy. However, the court charged the jury that it should consider plaintiff's shortened life expectancy in awarding damages for future medical expenses.
The court instructed the jury to consider plaintiff's life expectancy as set forth in the tables, instead of the diminished life expectancy *558 as set forth by the experts. The majority rule in this country is that a tort victim suing for damages for permanent injuries is permitted to recover loss of earnings based on life expectancy at the time of the injury, undiminished by any shortening of that expectancy as a result of the injury. Sea-Land Servs., Inc. v. Gaudet, 414 U.S. 573, 594, 94 S.Ct. 806, 819, 39 L.Ed.2d 9, 26 (1974), impliedly overruled on other grounds by Miles v. Apex Marine Corp., 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990). See Monias v. Endal, 330 Md. 274, 623 A.2d 656, 659 (1993) (proper measure of lost earnings damages for a plaintiff with reduced life expectancy caused by the defendant's negligence is loss based on life expectancy had the tortious conduct not occurred, rather than on shortened life); Morrison v. State, 516 P.2d 402, 406 (Alaska 1973) (future damages must be based on pre-injury life expectancy); Overly v. Ingalls Shipbuilding, Inc., 74 Cal.App.4th 164, 172-73, 87 Cal.Rptr.2d 626 (Cal.Ct.App.1999) (a plaintiff may recover for lost earnings during the period by which her life expectancy has been cut short); Doe v. State, 189 A.D.2d 199, 595 N.Y.S.2d 592, 596 (1993) (court erred in limiting the plaintiff's future economic loss to her post-injury life expectancy); Roers v. Engebretson, 479 N.W.2d 422, 424 (Minn.Ct.App.1992) (Minnesota is within a majority of jurisdictions that measure future loss by pre-injury life expectancy); In re Joint E. and S. Dist. Asbestos Litig., 726 F.Supp. 426, 429 (E.D.N.Y.1989) (if the injury shortens the plaintiff's life expectancy, the weight of American authority computes future earning loss on the basis of the life expectancy the plaintiff would have had without the injury). See also Restatement (Second) of Torts § 924 comment c (1977) (a plaintiff is entitled to damages measured by the extent to which his or her capacity for earnings has been reduced). But see Ehlinger v. State, 237 N.W.2d 784, 792 (Iowa 1976) (Iowa follows the minority rule that shortened life expectancy caused by the injury may be used to reduce damages when determining loss of earning capacity).
Plaintiffs cite to a somewhat similar factual case, Kurak v. A.P. Green Refractories Co., 298 N.J.Super. 304, 689 A.2d 757 (App.Div.1997), certif. denied, 152 N.J. 10, 702 A.2d 349 (1997). However, in Kurak, we did not address the issue raised here; namely, whether the life expectancy set forth in Appendix I is admissible where it directly conflicts with the expert testimony.
It was undisputed that plaintiff was injured as a result of either Rodricks's and Marstella's, or Salasin's, negligence, and that as a result of those injuries his life expectancy was likely shortened. In following the majority rule, the trial court did not err in instructing the jury to disregard the experts' testimony as to the shortened life expectancy, and instead measure future loss by pre-injury life expectancy. Sea-Land Services, supra, 414 U.S. at 594, 94 S.Ct. at 819, 39 L.Ed.2d at 26.
Rodricks and defendants should not be allowed to reap the benefits of plaintiff's shortened life expectancy, occasioned by their tortious conduct. To hold otherwise would reward them for causing injuries so severe that they resulted in plaintiff's premature death. It would also result in gross under-compensation to the injured plaintiffs, because as a result of plaintiff's premature death, he and his family would not be compensated for the years of lost earnings, loss of enjoyment of life, and loss of consortium. Of course, as properly charged by the court, future medical expenses should be based on plaintiff's shortened life expectancy, and not his pre-injury expectancy, because those damages compensated him for actual projected *559 expenses. Green, supra, 310 N.J.Super. at 536, 709 A.2d 205 (the expert recognized that the plaintiff's life expectancy because of his injuries had been shortened, and based his projected medical expenses on that basis).
Affirmed as to both direct appeals and the cross-appeal.
NOTES
[1] Plaintiffs refers to Woodrow Hall, by and through his guardian ad litem Sandra Hall, Sandra Hall, individually and as guardian ad litem of Carly Hall, Woodrow Hall, Jr., and Ryan Hall, minors.