50 A.3d 42

ROBERT B. BEIM AND FRANKLYN Z. ARONSON, AS CO–EXECU-
TORS OF THE ESTATE OF JOHN G. KELLOGG AND BARBARA
KELLOGG, FRANKLYN Z. ARONSON AS TRUSTEE OF THE
ANNE D. KELLOGG MARITAL TRUST AND JUDITH MEDINA
AND PRUDENCE KRAUSE, PLAINTIFFS-APPELLANTS, v.
TREVOR R. HULFISH AND TERESA CUPPLES, DEFEN-
DANTS–RESPONDENTS, AND RUSSELL MARKS, JR., AND
PATRICIA H. MARKS, DEFENDANTS, AND CHUBB INSUR-
ANCE COMPANY OF NEW JERSEY, DEFENDANT/INTERVE-
NOR–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued April 25, 2012—Decided May 29, 2012.

562

Before Judges FUENTES, J.N. HARRIS, and KOBLITZ.

*Jerrold Kamensky* argued the cause for appellants (*Kamensky, Cohen & Riechelson,* attorneys; *Mr. Kamensky* and *Kristin Teufel,* on the brief).

*Richard J. Mirra* argued the cause for respondents Trevor R. Hulfish and Teresa Cupples (*Hoagland, Longo, Moran, Dunst & Doukas, LLP,* attorneys; *Mr. Mirra,* of counsel and on the brief).

*Joseph A. Deer* argued the cause for respondent Chubb Insurance Company of New Jersey (*Bashwiner and Deer, LLC,* attorneys; *Mr. Deer,* on the brief; *John M. Bashwiner,* of counsel).

The opinion of the court was delivered by

JONATHAN N. HARRIS, J.A.D.

This appeal arises in connection with the Wrongful Death Act, *N.J.S.A.* 2A:31–1 to –6. The novel issue presented is whether an heir's loss of a prospective inheritance resulting from the imposition of increased estate taxes—incurred due to the premature death of a decedent—is recoverable in a wrongful death action. Because such a tangible, readily-calculable diminishment in an heir's expectancy is in the nature of "pecuniary injuries resulting

from such death," *N.J.S.A.* 2A:31–5, we conclude that it is an element of damages for the jury to consider in this case, subject to appropriate expert evidence. We reverse and remand for further proceedings.

I.

On January 25, 2008, John G. Kellogg and his second wife, Barbara Kellogg,[1] were passengers in an automobile owned by defendant Patricia Marks and operated by defendant Russell Marks. The Marks's vehicle collided with a car owned by defendant Teresa Cupples and operated by defendant Trevor R. Hulfish.

Mr. Kellogg was ninety-seven years old at the time of the accident. Immediately following the collision, he was treated at the University Medical Center at Princeton. He remained in the hospital for one week, and on February 1, 2008, he was discharged to the Merwick Rehabilitation Center. At the time of discharge, Mr. Kellogg was diagnosed with a displaced rib fracture, non-displaced rib-fracture, and a possible pulmonary contusion. Although showing initial signs of improvement, Mr. Kellogg's condition rapidly deteriorated, and on February 6, 2008, he returned to the hospital. Mr. Kellogg died one day later due to "blunt force injury sustained during the car crash." [2]

Plaintiffs Robert B. Beim and Franklyn Z. Aronson are the co-executors of the Estate of John G. Kellogg. Aronson is also trustee of the Anne D. Kellogg Marital Trust, which for many years served as Mr. Kellogg's primary source of income. Plaintiffs Judith Medina and Prudence Krause are John's and Anne's daughters.

---

[1] Mr. Kellogg's first wife, Anne D. Kellogg, died in the 1980s.

[2] This was the conclusion, "within reasonable medical certainty," of plaintiffs' expert Donald Jason, M.D., J.D.

In 2008, Mr. Kellogg's estate paid $1,196,083.57 in estate taxes. Plaintiffs allege that had Mr. Kellogg survived until 2009 or later, his estate's tax obligation would have been reduced by $626,083 in 2009, and by the full amount of $1,196,083.57 in 2010. *See* Economic Growth and Tax Relief Reconciliation Act of 2001 (the 2001 Act), *Pub.L.* No. 107–16, 115 *Stat.* 38, (codified as amended in scattered sections of 26 *U.S.C.*) (reducing estate taxes in 2009 and eliminating them entirely for 2010 only). The 2001 Act was set to expire on December 31, 2010, returning the estate tax to its pre-2001 configuration pursuant to a built-in sunset provision.

On December 17, 2010, the Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010 (the 2010 Act), *Pub.L.* No. 111–312, § 301, 124 *Stat.* 3296, (codified as amended in scattered sections of 26 *U.S.C.*) went into effect. The 2010 Act extended the estate tax provisions of the 2001 Act through 2012.

In the Law Division, plaintiffs sought to recover the difference in estate tax consequences between 2008 and a later year with reduced estate taxes (depending upon what year the jury determined was the appropriate date of death), as damages under the Wrongful Death Act. Their theory was that Mr. Kellogg's heirs suffered a lost inheritance—or at least the loss of a substantial portion of an inheritance—by the early imposition of greater estate taxes, and that such loss is recoverable as "pecuniary injuries" under *N.J.S.A.* 2A:31–5 since it was the fault of defendants' tortious conduct.

Plaintiffs' First Amended Complaint included the following theories of liability: wrongful death on behalf of the co-executors and Estate (count one); survival action on behalf of the co-executors and the Estate (count two); negligence on behalf of plaintiff Barbara Kellogg (count three); agency on behalf of Barbara Kellogg (count four); per quod on behalf of Barbara Kellogg (count five); negligence on behalf of the trustee and Marital Trust (count six); negligence on behalf of Medina (count seven); and negligence on behalf of Krause (count eight). The last three counts of the First Amended Complaint did not expressly cite the

Wrongful Death Act as a source of liability, but instead claimed that:

> [a]s a direct and proximate result of the aforesaid negligence of the defendants and each of them, [plaintiffs] have and will continue to suffer economic losses in the nature of Federal and State Estate Taxes and other related tax consequences that would not have been suffered but for the death of [p]laintiff[s'] [d]ecedent John Kellogg.

Defendants moved to dismiss counts six, seven, and eight pursuant to *Rule* 4:6–2(e). Plaintiffs conceded that dismissal was proper, but continued to press their theory of damages, presumably as encompassed by the wrongful death claim set forth in count one. The Law Division granted defendants' motion on December 8, 2010 (nine days before the 2010 Act became effective), stating that plaintiffs' damages were "too speculative in nature." The motion court recognized that "the concept of allowing the plaintiff[s] to introduce evidence of the deceased's tax liability resulting from the tax associated with the decedent's very death to establish damages is a matter of first impression in this state." It explained that the estate tax reprieve was established for 2009 and 2010, and that Congress was still debating what would apply in 2011 and beyond. Based upon *Rule* 1:13–5's mortality table, Mr. Kellogg was likely to live beyond 2010, and so his estate's tax liability could not be proven.[3]

Plaintiffs filed a motion for reconsideration, which was argued on February 4, 2011, several weeks after the 2010 Act was signed into law. Plaintiffs argued that the passage of the 2010 Act removed any speculation in the determination of damages because the estate tax structure for 2008 to 2012 was now firmly known, and the mortality table suggested that Mr. Kellogg would pass away during this time period. Thus, according to plaintiffs, an expert in estate taxation—most likely an accountant or tax lawyer—could readily compute the probable impact of the year of death on the estate's tax responsibility, and the net effect upon the heirs would be a mere mathematical computation.

---

[3] The life expectancy of a 97–year–old person is 3.20 years.

The motion court denied reconsideration, holding in part that the subsequent legislation did not cure the speculative nature of the impact of estate taxes because "the rights and liabilities of the parties are fixed as of the date of the tort or wrongful death." After the balance of plaintiffs' claims were dismissed either through motion practice or stipulation, this appeal ensued.

## II.

Because the relevant facts are undisputed, we turn to a de novo consideration of whether the motion judge correctly interpreted the breadth and scope of the Wrongful Death Act. *See Zabilowicz v. Kelsey,* 200 *N.J.* 507, 512–13, 984 *A.*2d 872 (2009).

The goal of the Wrongful Death Act is to compensate survivors of those wrongfully killed for their pecuniary losses. *Tenore v. Nu Car Carriers, Inc.,* 67 *N.J.* 466, 473, 341 *A.*2d 613 (1975). It "provides to decedent's heirs a right of recovery for pecuniary damages for their direct losses as a result of their relative's death due to the tortious conduct of another." *Aronberg v. Tolbert,* 207 *N.J.* 587, 593, 25 *A.*3d 1121 (2011). More than fifty years ago the Wrongful Death Act was recognized as remedial legislation, *Turon v. J. & L. Construction Company,* 8 *N.J.* 543, 555, 86 *A.*2d 192 (1952), but was limited to "pecuniary injuries" sustained by qualified beneficiaries. *N.J.S.A.* 2A:31–4 and –5. The legislative remedy "permits recovery only of a survivor's calculable economic loss." *Smith v. Whitaker,* 160 *N.J.* 221, 232, 734 *A.*2d 243 (1999).

A common form of pecuniary loss is future earnings that the "decedent would have contributed to his ... survivors had he lived." *Johnson v. Dobrosky,* 187 *N.J.* 594, 607, 902 *A.*2d 238 (2006) (citing *Curtis v. Finneran,* 83 *N.J.* 563, 567–68, 417 *A.*2d 15 (1980)). However, pecuniary loss encompasses other forms of damages as well, including "the 'lost' value of services such as companionship and care ... and the loss of advice, guidance and counsel." *Id.* at 607, 902 *A.*2d 238 (citing *Green v. Bittner,* 85 *N.J.*

1, 4, 424 *A.*2d 210 (1980)). The proper measure of damages in a wrongful death action is the deprivation of a reasonable expectation of a pecuniary advantage that would have resulted by a continuance of the life of the deceased. *Curtis, supra,* 83 *N.J.* at 569, 417 *A.*2d 15 (internal quotation and citations omitted).

A wrongful death action can only be brought for the benefit of a decedent's heirs. *N.J.S.A.* 2A:31–4. The action is commenced by either an administrator ad prosequendum of the decedent or an executor, if the decedent dies testate. *N.J.S.A.* 2A:31–2. As a matter of law, a wrongful death action does not accrue to the decedent. *Gershon v. Regency Diving Ctr., Inc.,* 368 *N.J.Super.* 237, 246, 845 *A.*2d 720 (App.Div.2004) (citing *Miller v. Estate of Sperling,* 166 *N.J.* 370, 383–84, 766 *A.*2d 738 (2001)). Accordingly, plaintiffs' claims for recovery of the increased estate taxes may be pursued, if at all, by Mr. Kellogg's co-executors Beim and Aronson in count one. Counts six, seven, and eight were properly dismissed.

Our research reveals only two reported decisions by state courts of last resort that have addressed whether increased estate taxes are pecuniary injuries under wrongful death statutes that are similar to our legislation. *See Elliott v. Willis,* 92 *Ill.*2d 530, 65 *Ill.Dec.* 852, 442 *N.E.*2d 163, 169 (1982) (holding that premature payment of estate taxes was not a recoverable loss in a wrongful death action because "[t]he test is a measurement of benefits of pecuniary value that the decedent might have been expected to contribute to the surviving spouse and children had the decedent lived"); *Farrar v. Brooklyn Union Gas Co.,* 73 *N.Y.*2d 802, 537 *N.Y.S.*2d 26, 533 *N.E.*2d 1055 (1988) (holding that federal estate tax credits that the decedent would have received had he lived longer could not be recovered in a wrongful death action absent express legislative authority). The only other consideration of the issue by a reported opinion of a state court comes from Florida. *See Lindsay v. Allstate,* 561 *So.*2d 427 (Fla.Dist.Ct.App.1990) (holding that the loss of prospective federal estate tax credits as a consequence of an insured's premature death is not an element of

damages under the Florida Wrongful Death Act).[4] Although these decisions support the Law Division's determination, we conclude that they reflect neither the view of our Legislature nor the expansive scope of our wrongful death jurisprudence.

In *Elliot*, the Illinois Supreme Court reviewed the plaintiff estate's claim that the payment of State inheritance and Federal estate taxes should be considered by the jury employing a loss-to-estate analysis that looked to the amount the decedent would reasonably be expected to save and accumulate. As part of its one-paragraph analysis rejecting such consideration, the court held:

> As we have previously noted, damages under the Wrongful Death Act are assessed in accordance with the loss to decedent's survivors. (Ill.Rev.Stat.1975, ch. 70, par. 2.) The test is a measurement of benefits of pecuniary value that the decedent might have been expected to contribute to the surviving spouse and children had the decedent lived. But whatever measurement is used to assess losses—loss of reasonable value of accumulation to the estate or not—we find no support in any jurisdiction that would permit the kind of recovery asked for by the estate here. The estate seeks to recover investment income that will be lost from cashing assets to discharge the estate's tax liability. It is not recoverable.
>
> [*Elliott, supra*, 65 *Ill.Dec.* 852, 442 *N.E.*2d at 169.]

We find this rationale neither persuasive nor consonant with the remedial purposes of our Wrongful Death Act.

In *Farrar*, the decedent's administrator sought recovery of $125,562 resulting from the loss of a Federal estate tax credit. *Farrar, supra*, 537 *N.Y.S.*2d at 26, 533 *N.E.*2d 1055. The administrator, successful in the lower courts, contended that had the decedent lived until 1987 instead of dying by asphyxiation in 1982 as a result of defendant's alleged negligence, the estate would have realized the full benefit of the Federal estate tax credit and no Federal estate tax would have been due and paid. *Ibid.* In its brief memorandum decision, the Court of Appeals held:

> The award of damages in a statutory wrongful death cause of action is strictly limited to "fair and just compensation for the pecuniary injuries resulting from the

---

[4] The Eleventh Circuit followed *Lindsay* in *Hiatt v. United States*, 910 *F.*2d 737 (11th Cir.1990).

decedent's death" (*EPTL* 5–4.3[a]). Absent express legislative authority, and there is none here, future tax liability is not considered when determining pecuniary loss (*see, Johnson v. Manhattan & Bronx Surface Tr. Operating Auth.* [71 *N.Y.*2d 198, 524 *N.Y.S.*2d 415, 419, 519 *N.E.*2d 326 (1988)] ). In this case, the administrator seeks recovery not of an earned, fixed tax credit, but of an inchoate one which decedent may have earned in futuro assuming at least these key factors remained the same—the amount and assets of the estate, the decedent's tax status, and the tax law itself. These are uncertain, dependent on future changeable events and, thus, inherently speculative. Such a loss is not compensable.

[*Id.* at 26–27, 533 *N.E.*2d 1055.]

Beyond the foregoing, the opinion contains no further guidance. Its reference to *Johnson*, however, is illuminating.

In *Johnson*, an appeal arising under New York's wrongful death legislation, the same court held that evidence of a decedent's gross income at the time of death is the standard to measure the value of income already lost and to measure the loss of future earnings. *Supra*, 524 *N.Y.S.*2d at 418, 519 *N.E.*2d 326. The rationale for this economically-unreal doctrine was couched in terms of trial management, rather than embedded in the legislation itself:

No crystal ball is available to juries to overcome the inevitable speculation concerning future tax status of an individual or future tax law itself. Trial strategies and tactics in wrongful death actions should not be allowed to deteriorate into battles between a new wave of experts consisting of accountants and economists in the interest of mathematical purity and of rigid logic over less precise common sense. Countless numbers of unknown and unpredictable variables for tax purposes alone include, as mere examples, future marital and family status, changes in rates, exemption and deduction provisions of overlapping tax codes. All sides to this issue would no doubt agree at least that this could produce much guesswork. So, a majority of jurisdictions have wisely stayed with a rule precluding evidence of after-tax income on the earnings damage issue to avoid "turning every negligence case into a trial [at least] of the future federal income tax structure" involving "a parade of tax experts[.]"

[*Ibid.*]

The New Jersey Supreme Court does not share the view that providing expert tax opinions to juries on the question of pecuniary injuries injects impermissible speculation and conjecture in wrongful death actions:

[W]e hold that under our wrongful death act, defendants must have an opportunity to cross-examine plaintiffs' witnesses to elicit testimony concerning deceased's income tax liability, or to develop the matter by extrinsic evidence, to the end that the jury be enabled to make an informed estimate, based upon the deceased's

projected net income after taxes, of the survivor's pecuniary loss. Consequently, plaintiff's recovery must be calculated on the basis of the deceased's net income after taxes giving due regard to the evidence adduced on the deceased's income tax liability.

[*Tenore, supra,* 67 *N.J.* at 494–95, 341 *A.2d* 613.]

The Court fortified this view of jury sophistication by noting:

[W]e have determined that the jury should have the benefit of evidence which will apprise them of the probable impact of income taxes on deceased's future losses. With the benefit of this evidence, the jury, guided by instructions to base future losses on net rather than gross income, can exercise its collective judgment in arriving at a just verdict under all the circumstances.

[*Ibid.*]

Moreover, "although ... some degree of conjecture is involved in making this adjustment in estimating losses in death cases, we are not persuaded that this degree of uncertainty requires us to close our eyes to realty." *Id.* at 493, 341 *A.2d* 613.

Although New York and New Jersey share similar statutory language, our wrongful death jurisprudence has developed differently. Because we readily consider tax consequences in the determination of pecuniary injuries, *Farrar* and its progeny are inapposite to the issue at hand.[5] "We decline to give simplicity paramount significance in fashioning the law of damages. Such an approach might aid the judiciary but hardly justice." *Tenore, supra,* 67 *N.J.* at 493, 341 *A.2d* 613.

In *Lindsay,* the Florida Third District Court of Appeal noted that its wrongful death legislation differed from New York's (and inferentially New Jersey's) statutory framework. It held as follows:

---

[5] *See, e.g., Kernke v. Menninger Clinic, Inc.,* 172 *F.Supp.2d* 1347, 1355 (D.Kan. 2001) (applying Kansas law and holding "Kansas courts have refused to permit the submission of future income tax liability to the jury for consideration in their calculation of damages because, among other things, future tax liability is too conjectural to be considered in fixing damages"). However, at least one New York trial court distinguished *Farrar,* holding that where a decedent's estate was subject to a higher tax due to a failed qualified personal residence trust, the lost tax advantage was potentially recoverable in a wrongful death action. *See Del Broccolo v. Torres,* 4 *Misc.3d* 510, 780 *N.Y.S.2d* 857, 859–60 (N.Y.Sup.Ct.2004).

Section 768.21(6)(a) of the Florida Wrongful Death Act, by comparison, appears to measure the loss to the decedent's estate as a consequence of an early death, without consideration for the consequences of federal estate taxes upon what would otherwise have been available for distribution. The interpretation flows from the statutory term "net accumulations" as plainly defined in section 768.18(5):

> [T]he part of the decedent's expected net business or salary income, including pension benefits, that the decedent probably would have retained as savings *and left as part of his estate* if he had lived his normal life expectancy.
>
> [Emphasis added.]

There is no language in the statute which suggests that the legislature intended the impact on the estate caused by federal tax laws, to be a factor in the computation of net accumulations under the Wrongful Death Act. Further, we are not permitted to tack additional words onto a statute for the purpose of aiding a liberal construction. *See Devin v. City of Hollywood,* 351 So.2d 1022 (Fla. 4th DCA 1976).

[*Lindsay, supra,* 561 So.2d at 428.]

Because the Florida wrongful death legislation is so unlike ours, we do not find *Lindsay* instructive.

 We have recognized that "[t]he measure of damages under the Wrongful Death Act is the 'deprivation of a reasonable expectation of a pecuniary advantage which would have resulted by a continuance of the life of the deceased.'" *Weiman v. Ippolito,* 129 N.J.Super. 578, 585, 324 A.2d 582 (App.Div.) (quoting *Dubil v. Labate,* 52 N.J. 255, 259, 245 A.2d 177 (1968)), *modified,* 130 N.J.Super. 207, 326 A.2d 70 (1974). In *Weiman,* we considered whether it was error not to award damages for a lost inheritance because the decedent's sons would have inherited money from the increase of their father's estate attributable to the growth of his insurance business. *Ibid.* In analyzing the specific proffer in *Weiman*—an expert's projections of the growth of decedent's business and the retention or accumulation of earnings—we agreed that such evidence was "too speculative and unreliable to be used as a basis for awarding damages for loss of inheritance." *Id.* at 587, 324 A.2d 582. However, we did not rebuff the lost inheritance theory of recovery, noting only that the trial court's conclusion that "decedent was a spender, not a saver" was amply supported by the record. *Ibid.*

We acknowledge that a conventional lost inheritance claim is not the same as a lost (or diminished) inheritance caused by the

premature imposition of estate taxes. However, both reflect a "deprivation of a reasonable expectation of a pecuniary advantage which would have resulted by a continuance of the life of the deceased." *Curtis, supra,* 83 *N.J.* at 569, 417 *A.*2d 15. "All probabilities and every reasonable expectation should be considered." *Ibid.*

Unfortunately, we do not have the benefit of specific expert opinion to accurately gauge whether plaintiffs' proofs suffer from the type of deficiencies identified in *Farrar* or *Weiman.* At the time the Law Division ruled on defendants' motions, plaintiffs were not yet obliged to produce their expert reports. However, we do not conceive that the methodology likely to be employed will be any more complicated or conjectural than that contemplated by *Tenore* and its progeny. Here, at the time of death (and at the time the complaint was filed), the estate tax consequences through the end of 2010 were known. It appears unchallenged that application of the 2008 estate tax structure resulted in a substantial diminution in Mr. Kellogg's heirs' net recovery compared to the consequences of applying the estate tax structures of either 2009 or 2010.

Similarly, in early December 2010—at the time when defendants' motion to dismiss was decided—the estate tax legal landscape continued unchanged, but it was undergoing intense political scrutiny.[6]

However, when the reconsideration motion was decided in February 2011, the estate tax consequences for 2011 and 2012 were firmly (if newly) adjusted. Given the narrow window of Mr. Kellogg's life expectancy, it was not unduly speculative to recognize that but for defendants' alleged tortious conduct he might have survived to a point that his estate's tax liability was eliminated, resulting in a tangible economic advantage to his heirs. The

---

[6] *See* Jennifer Steinhower, *Some Democrats Count on 'Millionaires' Strategy on Tax Cuts, N.Y. Times,* Dec. 2, 2010, www.nytimes.com/2010/12/03/us/politics/03 million.html.

amendatory provisions control the disposition of this case. *Stancil v. ACE USA,* 418 *N.J.Super.* 79, 82, 12 *A.*3d 223 (App.Div.) (citing *Pizzo Mantin Grp. v. Twp. of Randolph,* 137 *N.J.* 216, 235, 645 *A.*2d 89 (1994) (holding that under the time-of-decision rule, courts ordinarily apply the statute in effect at the time of the decision in order to effectuate current policy)), *certif. granted,* 207 *N.J.* 66, 23 *A.*3d 338 (2011).[7]

▬ Additionally, we conclude, subject to the admissibility of plaintiffs' expert evidence, that there is nothing unduly speculative about submitting the potential estate tax consequence of Mr. Kellogg's alleged premature death to a jury. Juries regularly consider the life expectancy of individuals in personal injury actions. *See Model Jury Charge (Civil),* § 8.11(G) "Life Expectancy" (1996). We find nothing unseemly about a jury considering—in assessing "such damages as they shall deem fair and just"[8]—the year of Mr. Kellogg's probable death.[9] This is not materially different from the usual life expectancy analysis performed by jurors, which permits them to consider competent evidence of life-threatening conditions. *See, e.g., Hall ex rel. Hall v. Rodricks,* 340 *N.J.Super.* 264, 274–76, 774 *A.*2d 551 (App.Div. 2001).

Without impinging upon the creativity and imagination of counsel, we could expect the parties to offer expert opinions in the fields of medicine and economics to illuminate life expectancy and mortality issues. *Cf. R.* 1:13–5 (providing that the table of mortal-

---

[7] Applying the law as of the date of decision, rather than as of the date of the wrongful death, is no more unfair than permitting qualified experts to opine on "future probable taxes," which must be considered in fixing damages in any wrongful death case. *Tenore, supra,* 67 *N.J.* at 493, 341 *A.*2d 613.

[8] *N.J.S.A.* 2A:31–5.

[9] We leave it to the trial judge to decide whether to ask the jury to answer a special interrogatory calling for the projected year of death in order to ensure that a verdict awarding damages, if any, to plaintiffs, is within the orbit of the Wrongful Death Act.

ity and life expectancy in the *Rules'* Appendix "shall be admissible in evidence as prima facie proof of the facts therein contained"); *see also Marendino v. Spitz,* 121 *N.J.L.* 556, 558, 3 *A.*2d 601 (E. & A.1938) (recognizing the utility of mortality tables but not requiring their use in the estimation of life expectancy in wrongful death actions). Additionally, accounting-related opinions could be mustered to explain taxation issues. This catalog of disciplines is for illustrative purposes only and is not intended to represent a minimum threshold or a maximum limit upon what could be made available to assist the jury in determining "such damages as they shall deem fair and just with reference to the pecuniary injuries resulting from such death." *N.J.S.A.* 2A:31–5.

There is nothing in this case that engenders unacceptable conjecture or speculation about the estate tax structure. In wrongful death cases, we tolerate relaxed evidentiary standards with respect to proof of damages. *See Lesniak v. Cnty. of Bergen,* 117 *N.J.* 12, 27, 563 *A.*2d 795 (1989) (using analogy from wrongful death jurisprudence to ease elements of proof of loss of future income by an injured infant); *see also Green, supra,* 85 *N.J.* at 15–17, 424 *A.*2d 210 (allowing damages in wrongful death cases, even though the inferences, and estimate of damages, are based on uncertainties). We harbor no fears that a properly instructed jury will produce a verdict that is based upon mere speculation.

Understandably, at the time of defendants' motion, the Law Division could confidently state that if Mr. Kellogg had lived to his actuarial life expectancy—beyond 2010—there would be no damages under plaintiffs' theory. This, however, did not eliminate a plausible argument that Mr. Kellogg might have perished in either 2009 or 2010, but plaintiffs were never allowed to proffer such evidence, even if it could have been assembled. However, at the time of the reconsideration motion, the law had changed, and the estate tax structure through 2012 was now known. Since it was probable—but not impossible—that Mr. Kellogg might not have survived beyond 2012, virtually all of the perceived uncertainty in the case was eliminated. Nevertheless, we do not discount the

possibility that Mr. Kellogg could have lived into 2013,[10] and subject to defendants' evidence of an otherwise hale and hearty Mr. Kellogg, they would not be precluded from arguing to a jury that his death would have happened later in the future, at a time when the estate tax consequences were either the same or even worse than in 2008.

In summary, we conclude that the Law Division's dismissal of all counts except for count one was correct. Count one's prayer for wrongful death remedies includes an element of damages for the estate tax impact, if any, to Mr. Kellogg's heirs occasioned by his death in 2008, rather than in a subsequent year.[11] Evidence sufficient to guide the jury on that issue must be accompanied by competent expert opinion so that the ultimate verdict is tethered to fair and just pecuniary damages, no more and no less.

Affirmed in part; reversed and remanded in part for further proceedings in conformity with this opinion.

---

[10] If Mr. Kellogg lived past New Years Eve 2012, he would have been 102 years old. We note that *Rule* 1:13–5's mortality table indicates that the life expectancy of all persons over the age of 100 is approximately two years and eight months.

[11] We decline to address, because it played no discernable role in the Law Division's decision, defendants' contention that no recovery is allowable because none of Mr. Kellogg's heirs were dependent upon him. *Cf. Gangemi v. Nat'l Health Labs., Inc.*, 291 *N.J.Super.* 569, 574–75, 677 A.2d 1163 (App.Div.1996). Defendants are free to litigate this issue on remand.